**FLEET NATIONAL BANK, as Trustee, Plaintiff,**

v.

**TRANS WORLD AIRLINES, INC., Defendant.**

**No. 91 Civ. 3508 (GLG).**

United States District Court, S.D. New York.

June 14, 1991.

---

**512**

Sullivan & Cromwell, New York City (Robinson B. Lacy, Michael J. Farrell, of counsel), for plaintiff.

Jones, Day, Reavis & Pogue, New York City (George T. Manning, Jane A. Rue, of counsel), for defendant.

## OPINION

GOETTEL, District Judge:

In what has unfortunately become an all too common situation for defendant Trans World Airlines, Inc. ("TWA"), this action presents an attempt by yet another group of its creditors to force TWA's compliance with its financial obligations. *See infra* note 1. Once again, success by the plaintiff on the ultimate merits of this action will imperil TWA's already precarious viability.

## I. FACTS

Plaintiff Fleet National Bank ("Fleet") is trustee for two sets of senior unsecured notes issued by TWA. One set of notes matures in 1992 and carries a 16% interest rate (the "16% notes"), while the other matures in 1993 and has an interest rate of 17¾% (the "17¾% notes"). Indentures between TWA and Fleet spell out the respective obligations of the two parties (the "Senior Indentures"). As of the close of calendar year 1990, $70 million of the 16% notes and $276 million of the 17¾% notes remained outstanding.

The indentures clearly articulate those incidents that will constitute an "Event of Default," which in turn trigger certain rights and obligations for the parties. Among these events of default are defaults on the 16% and 17¾% notes in issue, as well as defaults on any other indebtedness exceeding $5 million causing an acceleration of such indebtedness. Senior Indentures § 6.01. In this case, there is no dispute that there have been numerous events of default. In the first place, TWA failed to make interest payments on the senior unsecured notes in March (17¾% notes) and April (16% notes) of this year. Moreover, TWA failed to make payments on equipment trust certificates valued at over $5 million, which caused an acceleration of such obligations.[1] Finally, in February 1991, TWA failed to pay interest due on 15% senior secured notes due in 1994 that were issued pursuant to an indenture with Shawmut Bank, N.A. These notes also are valued at over $5 million and were accelerated.

Although these defaults are uncontroverted, the actual impetus behind this action is not simply TWA's failure to make interest payments on the senior notes (although litigation surely would have commenced at some point). Rather, this action was instigated by TWA's attempt to forestall bankruptcy by announcing a highly publicized offer to purchase a vast portion of its outstanding debt, which is estimated at $1.37 billion. This tender offer, which is set to expire at 7:00 p.m. on June 14, 1991, offers significantly less than face value for various debt instruments issued by TWA. TWA has offered 73 cents on the dollar for the 1991 and 1996 equipment trust certificates, 65 cents on the dollar for the 15% senior secured notes, 35 cents on the dollar for the 16% and 17¾% senior notes, and 17.5 cents on the dollar for certain Junior Subordinated Debentures due in 2001 and 2008 with a 12% interest rate (the "Junior Debentures"). These junior debentures represent some $670 million of TWA's total outstanding debt and it is TWA's proposal with respect to these debentures that provoked this suit.[2]

---

1. The defaults on the equipment trust certificates have already been the subject of litigation before this court. *See Connecticut National Bank v. Trans World Airlines, Inc.,* 762 F.Supp. 76 (S.D.N.Y.1991) [hereinafter *Connecticut National Bank*].

2. Of the $670 million outstanding on these junior debentures, approximately $189 million is

The junior indentures between TWA and National Westminster Bank, USA, as trustee, pursuant to which the junior debentures issued, provide that:

> the indebtedness evidenced by the Securities is subordinated in right of payment, to the extent and in the manner provided in this Article, to the prior payments in full of all Senior Indebtedness, that these provisions are for the benefit of the holders of Senior Indebtedness, and that each holder of Senior Indebtedness whether now outstanding or hereafter created, incurred, assumed or guaranteed shall be deemed to have acquired Senior Indebtedness in reliance upon the covenants and provisions contained in this Indenture and the Securities.

Junior Indentures § 10.01. Furthermore, the junior indentures specifically state that if there has been a default on any senior indebtedness, TWA is prohibited from making any payment with respect to the junior debentures or from acquiring any junior debentures with cash or property. Junior Indentures § 10.03. In light of these provisions, TWA's tender offer is expressly conditioned on its ability to amend the indentures to permit payment to the junior debentureholders even in the presence of defaults on senior indebtedness. An additional condition of the tender offer is that the 15% senior secured notes, which specifically state that there can be no payment to junior debentureholders if there has been a default on the 15% notes, must be amended to permit such payments. The 16% and 17¾% indentures contain no similar specific prohibition from paying the junior debentureholders and, thus, do not require amending. TWA proposes to amend the junior indentures by obtaining approval from their debentureholders, but without consulting the holders of the 16% and 17¾% notes.

Thereafter this action was started. Plaintiff's complaint seeks damages for failure to pay interest on the 16% and 17¾% notes, as well as a preliminary and

permanent injunction prohibiting TWA from amending the subordination provisions of the 12% Junior Subordinated Indentures in the manner contemplated. Presently before us is plaintiff's application for a preliminary injunction, which was brought on by order to show cause and argued on May 31, 1991. Since that time, the parties have engaged in limited discovery with respect to the issue of whether the trustee, Fleet, or the senior noteholders themselves are responsible for and controlling this action. We note that while the complaint only addresses the amendment of the junior indentures, the application for the preliminary injunction seeks to enjoin both the amendment and the actual purchase by TWA of any of the 12% debentures. Of course, one is a condition precedent to the other and the discrepancy may be of no significance.

## II. DISCUSSION

### A. *Procedural Arguments*

TWA initially raises numerous procedural objections to the bringing of this action and, specifically, the application for a preliminary injunction. We will address these issues before turning to the merits of the preliminary injunction motion.

#### 1. Standing

■ TWA first challenges whether Fleet, as trustee, has standing to prosecute this action.

It is axiomatic that the powers of an indenture trustee are limited to those specifically articulated in the indentures themselves. *See Meckel v. Continental Resources Co.,* 758 F.2d 811, 816 (2d Cir.1985) ("an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement"). In this regard, both parties recognize that if an event of default occurs, Fleet can take any action to enforce the 16% and 17¾% indentures and to collect principal and interest from TWA.

held by affiliates of Carl C. Icahn, the Chairman of the Board and Chief Executive Officer of TWA. These affiliates also hold approximately ninety percent of the outstanding common stock

of TWA. While the Icahn affiliates can tender their debentures in response to TWA's offer, their debentures cannot be voted with respect to the amendments of the indentures. *See infra.*

Senior Indentures § 6.03. TWA proceeds to argue, however, that Fleet actually is attempting to enforce not the indentures to which it is trustee, but the 12% subordinated indentures and the subordination provisions contained therein, which place limitations upon payments to junior debentureholders in the event of defaults on senior indebtedness. Thus, TWA contends that Fleet is acting outside the scope of its authority as trustee.

This argument fails in numerous respects. First of all, this action is clearly one to collect principal and interest from TWA. The fact that plaintiff is taking a collateral route to insure and effectuate such collection is necessitated by the tender offer and TWA's attempt to amend the junior indentures. If Fleet had not sought this injunction, there would be less assets available from which the senior noteholders could collect principal and interest in light of TWA's financial condition, discussed hereafter. Therefore, this is clearly an action encompassed within the powers granted by the senior indentures, which permit the trustee to pursue "any available remedy by proceeding at law or in equity" to collect principal or interest. Senior Indentures § 6.03. The fact that TWA believes the tender offers may make TWA financially viable is of no moment since it is the trustee's judgment that is at issue and Fleet apparently has concluded that its noteholders will be better protected if the tender offer is enjoined. We note that the aforementioned provision of the indentures is consistent with the Trust Indenture Act, which provides that a trustee can sue to recover a judgment "in its own name and as trustee of an express trust." 15 U.S.C. § 77qqq. This recognizes the fact that it is impractical, not to mention wasteful, to expect the numerous noteholders to organize or bring individual actions.[3]

Thus, we conclude that the senior indentures empower Fleet to prosecute this action.

**2. Jurisdiction**

■ The next issue raised by TWA is that this court lacks jurisdiction because there is incomplete diversity between the defendant and the senior noteholders, who are allegedly controlling the litigation as the real plaintiffs in interest. There is no question that if Fleet remains the only plaintiff, diversity jurisdiction exists, just as the inclusion of all senior noteholders as plaintiffs would destroy diversity.

TWA's argument is similar to that raised in the *Connecticut National Bank* case. *See supra* note 1. There, as here, TWA argued that the trustee was merely a "'naked trustee[ ]' [acting] as [a] 'mere conduit' for a remedy flowing to others." *Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 465, 100 S.Ct. 1779, 1784, 64 L.Ed.2d 425 (1980) (citations omitted). In *Connecticut National Bank* we very easily disposed of the issue, one controlling factor being that the trustee was the only party able to seek return of the security at issue, in that case airplanes and engines. While the noteholders could have sued for money damages, and in fact some did bring such an action in state court, the trustee had to sue for return of the security in the likely event that TWA could not satisfy a money judgment in the amount sought. In the case at bar, since the debts to the senior noteholders are unsecured, TWA claims that the *Connecticut National Bank* decision can be distinguished and Fleet declared a "naked trustee" under the *Navarro Savings* analysis.

While the facts presented do not lend themselves to as simple a conclusion as was reached in *Connecticut National Bank*, TWA's argument remains unpersuasive. This is not a situation contemplated by the *Navarro Savings* Court wherein the trustee has no powers and no relation to the case itself, but rather, is named solely because of procedural requirements that the case be brought in another's name. *Cf. Harris Trust & Sav. Bank v. E–II Hold-*

---

**3.** We are told that certain senior noteholders have brought suit on the defaults in the Supreme Court of the State of New York, County of New York. We do not know the status of that action, but the mere filing of that suit does not detract from the judicial economy of litigating the entire dispute in one forum.

*ings, Inc.*, 926 F.2d 636, 639 n. 7 (7th Cir.1991) (citizenship of trustee, not beneficiaries, relevant for determining if diversity jurisdiction exists). In the case before us, the indentures authorize Fleet to accelerate the notes, pursue remedies at law and equity, and to recover in its own name as trustee of an express trust. Senior Indentures §§ 6.02, 6.03, and 6.08. It is ironic that now that TWA has defaulted, it seeks to abrogate its agreement and the express provisions of the indentures. In fact, since absent an action by the trustee TWA might well be forced to defend actions throughout the country, TWA probably had some interest at the time the indentures were drafted in insuring that any disputes would be litigated in one forum. TWA is not entitled to have it both ways.

We note that the focus of discovery in this case has been on determining whether Fleet or the senior noteholders controls the litigation. While it is clear that some noteholders were favorably inclined to bringing this action, it would be irrelevant even if 100% of the noteholders had been located and had given their consent to the trustee's actions. This does not render the trustee a naked trustee because the fact remains that Fleet's actions are consistent with its obligations under the indentures, notwithstanding the fact that the funds it may collect will inure to the benefit of the noteholders. In consonance with this finding is the fact that section 6.06 of the senior indentures imposes five requirements on the noteholders before they can sue on their own behalf. One such requirement is that sixty days elapse after the holders of at least 25% of the outstanding notes request that the trustee bring the suit. This clearly presumes that the trustee should be given the first chance to bring the suit. Moreover, had there been an attempt to wait sixty days, the tender offer could not have been enjoined since it is dated May 16 and expires on June 14.

For all the foregoing reasons, we find that Fleet is not a naked trustee and that it is its citizenship, which is diverse from

TWA's, that governs. Therefore, this court has jurisdiction to entertain this action.

3. Absence of Indispensable Parties

■ The final procedural argument raised by TWA is that this action cannot proceed in the absence of indispensable parties whose presence would destroy diversity jurisdiction. In this case, the 12% junior debentureholders are the ostensibly indispensable parties. TWA argues under Federal Rule of Civil Procedure 19 that the junior debentureholders are necessary because they claim an interest relating to the subject of the action and are so situated that the disposition of the action in their absence may impair their ability to protect that interest. Fed.R.Civ.P. 19(a)(2). TWA also claims that if a party seeks to enjoin the performance of a contract between an opposing party and a third party, then the third party is a necessary party. *See Crouse–Hinds Co. v. InterNorth, Inc.*, 634 F.2d 690, 700–01 (2d Cir.1980). This straw man argument is rejected in its entirety.

The junior debentureholders have no interest in TWA's failure to pay the senior noteholders, nor do they have any rights greater than those of the senior noteholders. TWA's offer, however, attempts to unilaterally afford the junior debentureholders greater rights vis-a-vis the senior noteholders than they are otherwise entitled to. TWA cannot engage in such practices and then claim that because Fleet seeks to enforce its rights and prevent the junior debentureholders from diminishing the senior noteholders priority, the junior debentureholders become indispensable. The dispute is between Fleet and TWA, and involves TWA's attempt to eliminate certain rights of senior noteholders. Fleet is not attempting to enjoin any contract between TWA and the junior debentureholders, but rather, is seeking to enjoin the payment of funds to which it has a priority. Thus, the junior debentureholders are neither necessary nor indispensable and the case can proceed in their absence.[4]

---

**4.** We have little doubt that the junior debentureholders will agree to amend the indentures.

However, the mere fact that they might agree with what TWA is doing, regardless of whether

B. *Preliminary Injunction*

We now turn to the merits of the preliminary injunction application. The standards in this circuit for a preliminary injunction are beyond cavil and need not be discussed in detail. It is an extraordinary remedy, which is to be granted only upon the applicant's showing of "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons*, 596 F.2d 70, 72 (2d Cir.1979). In addition, the threat of irreparable harm must be imminent and actual, not merely speculative. *New York v. Nuclear Regulatory Comm'n*, 550 F.2d 745, 755 (2d Cir.1977).

1. Imminent & Irreparable Harm

■ Fleet claims that the failure to grant injunctive relief will lead to imminent and irreparable harm. Specifically, it argues that if the junior debentureholders are paid, even at 17.5 cents on the dollar, there will be less available to satisfy a judgment in favor of the senior noteholders in light of TWA's precarious financial situation. Moreover, if TWA's actions in paying the junior debentureholders, assuming it has obtained the necessary amendments and regulatory approval, *see infra*, are deemed wrongful, it will be impossible to locate all the junior debentureholders and impractical to seek return of the money from each of them.

In response, TWA claims that the alleged harm Fleet will suffer is neither imminent nor irreparable. TWA argues first that the harm is not imminent because before any funds can be paid to the junior debentureholders, amendments to the junior indentures and the 15% indentures must be obtained. In addition, the Securities & Exchange Commission ("SEC") must approve the tender offers and while the necessary materials have been filed with the SEC, there has not yet been any official approval of the proposal. With respect to the need for the junior debentureholders' consent to amend the indentures, we see absolutely no reason why they would not agree to the amendment. The amendment would afford them an opportunity to receive payment even in the face of defaults on senior indebtedness. While we commend the attempt by TWA to reorganize outside the scope of bankruptcy, it is important to carefully analyze what the offer attempts to achieve. TWA is unilaterally placing junior debentureholders (one-third of whose outstanding value is held by affiliates of Carl Icahn, *see supra* note 2), who in the event of a bankruptcy would probably receive no payment, in a similar position to that of senior noteholders in terms of priority of payment, the only difference being the percentage of face value TWA will pay the respective groups. The junior debentureholders, therefore, assuming they have decided that 17.5 cents on the dollar is a reasonable offer, have absolutely nothing to lose and something to gain by agreeing to amend the indentures.[5] Whether the 15% noteholders will agree to make the necessary amendments to their indenture is another question, as is the question of SEC approval.[6] Moreover, there is substantial disagreement as to how quickly TWA can purchase the junior debentures if all necessary approvals are obtained, but conceivably, it could occur within a few days.

We need not resolve these questions, however, because the harm is imminent in one crucial respect. Since TWA is also

---

TWA's actions are proper, does not make the junior debentureholders indispensable.

**5.** In this regard, we note that TWA's suggestion that by entering a preliminary injunction this court would be interfering with TWA's business judgment as to how best to run its company is simply erroneous. We do not sit as a court in equity attempting to preserve a faltering business. Rather, by granting an injunction, this court is protecting the rights of senior notehold-

ers to enforce their rights as third-party beneficiaries. *See infra.*

**6.** The 15% noteholders are being offered twice the amount being offered the 16% and 17¾% noteholders. This may be relevant in their decision to amend their indenture since 65 cents on the dollar might be more than they would receive if TWA files in bankruptcy and is liquidated.

seeking tenders from the senior noteholders, and since the offers expire at the same time, those senior noteholders will be unable to make an informed decision on the offer without knowing of the disposition of the issue with respect to the junior debentureholders. The decisions made by the senior noteholders may vary depending on whether this court enjoins TWA from soliciting amendments to the junior indentures. Similarly, even though TWA's obligations to tendering senior noteholders will be discharged, there remains the risk to those who do not tender that the value of their notes and their ultimate collectability will be adversely affected by payments to junior debentureholders. Finally, and this ties in directly to the issue of irreparable harm, if the junior debentureholders are paid, as noted above, there is little likelihood that Fleet could get all the money back in the event we deem the payments to have been wrongful. Thus, harm to the senior noteholders in being forced to make a decision before the two tender offers expire is imminent.

█ This turns us to the issue of whether the harm is actually irreparable. TWA argues that this is merely an action for money damages and Fleet should simply procure a money judgment to protect its rights. However, as we recognized in *Connecticut National Bank,* "[t]he suggestion that by obtaining a money judgment [Fleet] will be adequately protected is nothing short of specious. TWA has been teetering on the brink of bankruptcy for years and it is unlikely that it possesses the cash in its coffers to satisfy such a judgment." Slip op. at 8. In this case, it is not simply likely that TWA cannot meet its obligations, it is definite. As TWA states in its tender offer, without the offers "TWA believes that it may virtually exhaust its cash reserves by mid–1992." Tender Offer at 1. In fact, even if the offer goes forward and substantial amounts of the debt are discharged, TWA recognizes that it is not necessarily out of trouble in light of other outstanding problems. *See* Tender Offer at 1. There is simply no way that Fleet can protect itself without receiving a preliminary injunction.

It is true that if monetary damages are adequate, a preliminary injunction ordinarily will not issue. However, when there is absolutely no possibility that the judgment can be satisfied in full, a preliminary injunction is entirely appropriate. *See Hoxworth v. Blinder, Robinson & Co.,* 903 F.2d 186, 206 (3d Cir.1990) ("the unsatisfiability of a money judgment can constitute irreparable injury"). In a case curiously cited by TWA, the court, in refusing to issue a preliminary injunction, stated that "plaintiff has made no showing whatsoever that the defendants will be ... unable to satisfy fully any money judgment against them." *Firemen's Ins. Co. v. Keating,* 753 F.Supp. 1146, 1153 (S.D.N.Y.1990). In the case at bar, Fleet has made precisely such a showing and, in fact, TWA has admitted that it cannot satisfy a judgment against it. Thus, irreparable harm is entirely likely if the injunction were not to issue.

2. Likelihood of Success on the Merits

Since we conclude that Fleet is likely to succeed on the merits of this litigation, our analysis need only focus on this question and we need not consider the balance of hardships.

█ TWA argues that Fleet cannot prevent the amendment to the subordinated indentures that seeks to allow payment to the junior debentureholders even in the presence of numerous events of default. There can be no disputing the fact that the Fleet noteholders are clearly third-party beneficiaries of the subordinated indentures since these indentures are replete with language such as: "[t]he Company agrees ... that the indebtedness evidenced by the Securities is subordinated in right of payment ... to the prior payments in full of all Senior Indebtedness." Junior Indentures § 10.01. *See Septembertide Publishing, B.V. v. Stein & Day, Inc.,* 884 F.2d 675, 679–80 (2d Cir.1989) (crucial inquiry under New York law is whether the third party is the intended beneficiary of a promise). Fleet then argues that the subordina-

tion provisions of article 10 cannot be modified without the consent of the third-party beneficiaries once the third-party beneficiaries have relied on those provisions of the indentures. In this regard, even if actual reliance cannot be established as to the original purchasers of the senior notes because the junior debentures issued after the senior notes, the junior indentures themselves state that reliance on the subordination provisions of article 10 will be presumed regardless of when the senior indebtedness was created. Junior Indentures § 10.01.[7] Thus, Fleet would obviously prevail were this our only inquiry. However, TWA states that if the parties to the contract creating third-party beneficiary rights (in this case the subordinated indentures) expressly reserve the right to amend the contract, the contract can be amended without approval of the third-party beneficiaries even if the beneficiaries have relied on the contract. If this is the state of the law, the inquiry must then focus upon the junior indentures and whether the power to amend the subordination provisions has been reserved.

Article 9 of the junior indentures establishes the procedures for amending the indentures. Section 9.01 states that TWA and the trustee may amend the indentures without consent of the noteholders "to make any change that does not materially adversely affect the rights of any [Junior] Securityholder." Junior Indentures § 9.01(4). Furthermore, TWA and the trustee can "without notice to any Securityholder but with the written consent of the Holders of at least a majority in principal amount of the outstanding Securities" amend any provision of the indentures. However, "without the consent of each [Junior] Securityholder affected, an amend-

ment ... may not ... modify the provisions of Article 10 hereof in any manner adverse to the [Junior] [Security]holders." Junior Indentures § 9.02(6). TWA suggests that section 9.02(6) clearly contemplates amendments to article 10. However, only if junior debentureholders will be harmed by the amendment to article 10 is even their approval needed. Taking TWA's argument to its logical progression, since TWA is not doing anything adverse to the interests of the junior debentureholders, it can modify the provisions of article 10 without obtaining the junior debentureholders' approval. Here, where TWA's amendment of the subordination provision obviously is not adverse to the interests of the *junior* debentureholders, it would not need the approval it is actively soliciting.[8]

Fleet responds that article 10 limits the ability of TWA and the junior debentureholders to modify article 10's subordination provisions. First, section 10.01 states that "[e]xcept as expressly set forth in this Indenture ... to the contrary, all the provisions of this Indenture ... shall be subject to the provisions of this Article 10." Junior Indentures § 10.01. While TWA contends that section 9.02(6) actually does provide to the contrary, we disagree. All section 9.02(6) states is that one cannot modify article 10 in a manner adverse to the junior debentureholders without obtaining their approval. It does not state that one can amend the provisions of article 10, which subordinates junior indebtedness to senior indebtedness, in such a way that article 10 is rendered worthless to senior noteholders. In addition, section 10.09, entitled "Subordination May Not Be Impaired by Company," specifically states that "[n]o right of any holder of Senior Indebtedness to enforce the subordination of the indebtedness evi-

---

**7.** It is also entirely reasonable to expect that senior noteholders would presume that their rights would never be diminished by debentureholders junior to them. This is the purpose of the designations "senior" and "junior subordinated."

**8.** We recognize that there is some ambiguity in sections 9.01 and 9.02 of the junior indentures. In this regard, while we believe that TWA's

flawed interpretation of the indentures' provisions would entitle it to proceed without approval of the junior debentureholders, TWA considers itself obligated to obtain majority approval. As will be seen, however, regardless of which interpretation is correct, TWA does not have the right to make its proposed amendment to the junior indentures.

denced by the Securities shall be impaired by any act or failure to act by the Company or by its failure to comply with this Indenture." Junior Indentures § 10.09.

Finally, section 2.01 of the subordinated indentures "irrevocably" designates the debentures as "Junior Subordinated Indebtedness." It is simply preposterous to suggest that, notwithstanding all of this language, TWA retained the independent power to amend the junior indentures to place junior debentureholders on a par with senior noteholders. Such a result is clearly not contemplated by the junior indentures, or by reasonable business practices. The interpretation TWA attempts to give the junior indentures would prevent senior unsecured noteholders from ever feeling safe in their investment.[9]

For all the foregoing reasons, we conclude that Fleet has established a likelihood of success on the merits.

### 3. Breadth of Injunction and Bond

Having satisfied all the necessary elements for the granting of a preliminary injunction, and having disposed of each of the procedural arguments advanced against the motion by TWA, plaintiff's application must be granted. However, we note that Fleet's application seeks to prevent the purchase of junior debentures, as well as the amendment of section 10.03 of the junior indentures, by "TWA, its officers, directors, agents, servants, employees and attorneys, and all persons in active concert or participation with any or all of them." We do not understand the need for such a broad injunction and the injunction will prevent the aforementioned actions by TWA alone, or by those parties utilizing TWA's corporate funds. This injunction does not prevent such actions by interested parties using non-TWA funds.

■ The final question is whether Fleet must post a bond. Federal Rule of Civil Procedure 65(c) states:

No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Fed.R.Civ.P. 65(c). TWA argues that a substantial bond must issue because an injunction will prevent it from retiring the debt to the junior debentureholders who would otherwise tender. TWA suggests that the risk it encounters is the difference between the face value of the outstanding debentures, plus interest, and the cost to TWA of purchasing the debentures for 17.5 cents on the dollar. While TWA's calculation of this equation, based on an assumption that one-half the junior debentureholders would have tendered, reaches the hundreds of millions of dollars range, TWA has graciously limited its demand for a bond to an amount of $100 million.

In response, Fleet correctly argues that the indentures themselves state that Fleet "shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers." Senior Indentures § 7.02(d). Obviously, we believe that Fleet has acted in good faith and, therefore, since Fleet cannot be liable to TWA it need not post a bond.[10]

The Court has contemporaneously issued a preliminary injunction order in accord-

---

**9.** We recognize that the trustee for the 16% and 17¾% noteholders could have, and in hindsight, should have demanded a provision in the indentures preventing the diminishment of the senior noteholders' rights vis-a-vis junior debentureholders. This was included in the 15% indentures and is the reason why their approval to amend the provision must be solicited. Notwithstanding this omission, however, TWA has no right to engage in its present course of action.

**10.** Even absent the contractual provision eliminating Fleet's liability to TWA, the only cost to TWA for the wrongful issuance of an injunction would be the cost of instituting a new tender offer for the junior debentures. TWA has already stated that it is not able to meet its financial obligations, *see* Tender Offer at 1, and there-

ance with the terms of this Opinion.[11]

SO ORDERED.

fore, there is no question of TWA paying its creditors in the foreseeable future.

11. Since the issue is not before us, we need not consider whether TWA could proceed with the tender offer by obtaining approval from the senior noteholders themselves to permit the payments to the junior debentureholders.