YUCYCO, LTD., Plaintiff,

v.

REPUBLIC OF SLOVENIA, Ljubljanska Banka d.d., Kreditna Banka Maribor d.d., Banka Slovenije, Nova Ljubljanska Banka d.d., Nova Kreditna Banka Maribor d.d., and The Chase Manhattan Bank f/k/a Chemical Bank, N.A., Defendants.

No. 96 CIV. 4274(DC).

United States District Court, S.D. New York.

Nov. 18, 1997.

86.  *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994).

LeBoeuf, Lamb, Greene & MacRae, L.L.P. by Stephen H. Orel, Lorna M. McKenzie, New York, NY, Richard A. Schechter, Stanley C. Macel, IV, Washington DC, for Yucyco, Ltd.

Cleary, Gottlieb, Steen & Hamilton by Jonathan I. Blackman, Boaz S. Morag, Lisa M. Schweitzer, New York, NY, for Slovenian Defendants.

Simpson, Thacher & Bartlett by Melvyn L. Cantor, John D. Soriano, New York, NY, for Defendant Chase Manhattan Intern., Ltd.

## OPINION

CHIN, District Judge.

This case arises from the violent collapse and fragmentation of the former Socialist Federal Republic of Yugoslavia ("Yugoslavia"). Instead of one nation, there are now five successor states, including the fledgling Republic of Slovenia ("Slovenia"). The critical issue presented is whether Slovenia is liable for the obligations of the former Yugoslavia and its state-controlled banking institutions.

Plaintiff Yucyco, Ltd. ("Yucyco"), a Cyprus corporation, is the owner of $29.5 million in loans made to certain Yugoslavian banks and guaranteed by Yugoslavia under a refinancing agreement, the New Financing Agreement of 1988 (the "NFA"). In June 1996, after the dissolution of Yugoslavia and the creation of the five new republics, Slovenia agreed to assume a share of the former Yugoslavia's debts by offering creditors the opportunity to exchange a portion of their loans for newly-issued Slovenian obligations. Slovenia did so in an effort to normalize its relations with the world financial community. Certain creditors, however, were not permitted to participate in the exchange because they had been placed by the United States on a list of entities identified with one of the other new republics, the Federal Republic of Yugoslavia ("Serbia–Montenegro"), which the United States had concluded presented a threat to the national security, foreign policy, and economy of the United States. Yucyco was one of these listed entities.

Yucyco commenced this action against Slovenia, the central bank of Slovenia (Banka Slovenije), four other Slovenian banks (Ljubljanska Banka d.d., Kreditna Banka Maribor d.d., Nova Ljubljanska Banka d.d., and Nova Kreditna Banka Maribor d.d.) (collectively the "Slovenian defendants"), as well as Chase Manhattan Bank ("Chase"). Ljubljanska Banka d.d. and Kreditna Banka Maribor d.d. were original signatories to the NFA, and Nova Ljubljanska Banka d.d. and Nova Kreditna Banka Maribor d.d. are al-

leged to be their successors-in-interest. Chase is sued solely in its capacity as agent under the NFA.

Yucyco seeks to hold the Slovenia defendants liable for the $29.5 million in loans. Alternatively, it contends that the Slovenian defendants should be ordered to permit Yucyco to participate in the exchange on the same terms as other creditors under the NFA. Finally, Yucyco asserts an alternative claim for tortious interference with contract.

Before the Court are two motions to dismiss. The Slovenian defendants move to dismiss the complaint pursuant to Fed R. Civ. P. 12(b)(1), (2), (5), (6), and (7). Chase moves to dismiss the complaint for failure to state a claim, or in the alternative, for summary judgment.

For the reasons that follow, the Slovenian defendants' motion is granted in part and denied in part. Chase's motion is granted in all respects.

## BACKGROUND

### A. The Dissolution of Yugoslavia

Yugoslavia existed as a nation from 1918 until 1991. After World War I, Slovenes, Croats, Bosnians, and the pre-war states of Serbia and Montenegro joined to form what eventually became known as the Kingdom of Yugoslavia. In 1945, following World War II, the Federal People's Republic of Yugoslavia was created under the leadership of Joseph Broz Tito and the Communist Party. In 1963, the federation was renamed the Socialist Federal Republic of Yugoslavia, and a new constitution was adopted in 1974.

Tito died in 1980. As the Tito regime came to an end, a system of collective leadership was instituted, in keeping with the 1974 constitution. Strife and inter-ethnic conflict arose as separatist movements in the individual republics and provinces grew. In the late 1980's, under the leadership of Slobodan Milosevic, Serbia became more and more aggressive, and in 1989, Serbia proposed abolishing the 1974 constitution.

The breakup of Yugoslavia took a significant turn in December 1990 as over 90% of the Slovenian populace voted in favor of inde-

pendence from Yugoslavia and formation of a new state. Slovenia formally declared its independence on June 25, 1991. Croatia, Bosnia–Herzegovina, and Macedonia soon followed suit, and by 1993, all four republics had been formally recognized by the United Nations.

On April 27, 1992 the remaining Yugoslav territories, Serbia and Montenegro, issued a joint declaration formally dissolving the former Yugoslavia and claiming to be the sole successor state. The other republics disputed Serbia's claim of sovereign continuity, and on May 30, 1992 the U.N. Security Council passed Resolution 757, which declared that "the claim by the Federal Republic of Yugoslavia (Serbia and Montenegro) to continue automatically the membership of the former Socialist Federal Republic of Yugoslavia in the United Nations has not been generally accepted." 31 I.L.M. 1427, 1454 (1992). Four months later, the U.N. Security Council denied Serbia–Montenegro's request to continue automatic U.N. membership as Yugoslavia's sole successor but invited the republic to formally apply for membership.[1] *See* U.N.S.C. Res. 777, 31 I.L.M. at 1473 (" [T]he state formerly known as the Socialist Federal Republic of Yugoslavia has ceased to exist.").

Although Serbia–Montenegro has not been fully embraced by the international community, the republic continues to conduct its affairs as an unrecognized state. Hence, the nation of Yugoslavia has been succeeded by five separate republics: Slovenia, Bosnia–Herzegovina, Croatia, Macedonia, and Serbia–Montenegro.

**1.** In the meantime, war had broken out in the Bosnia region and widespread "forcible [ethnic] expulsions" became commonplace. U.N.S.C. Res. 752, 31 I.L.M. at 145 (deploring "violent deterioration" and demanding compliance with April 12, 1992 cease-fire); *see also* U.N.S.C. Res. 757, 31 I.L.M. at 1453 (calling for "immediate cessation of forcible expulsions and attempts to change the ethnic composition of the populace"). For further discussion of the actions taken by the international community after the collapse of Yugoslavia, see U.N.S.C. Res. 713 (1991), 31 I.L.M. 1427, 1431 (1992) (imposing weapons embargo against Yugoslavia); U.N.S.C. Res. 757 (1992), 31 I.L.M. at 1455–56 (directing member nations to enforce trade embargo against Serbia and

## B. *The NFA and Yugoslavia's Guaranty*

As a consequence of the economic difficulties of the 1980's, Yugoslavia and its state-controlled banks were forced to restructure the debt that they owed to foreign financial institutions. The NFA, signed in 1988, was the last in a series of debt restructuring agreements that involved hundreds of international banks and other financial institutions. In accordance with the terms of the NFA, creditors (non-Yugoslavian financial institutions) provided approximately $7 billion in refinancing to the Yugoslav banks that were party to the NFA. The refinancing loans were secured by a guaranty (the "Guaranty") separately executed by the government of Yugoslavia.

By 1991, the principal amount of the outstanding loans under the NFA had been reduced to approximately $4 billion.

## C. *The Exchange*

The dissolution of Yugoslavia left its financial obligations in a state of turmoil. Uncertainty existed as to whether its financial obligations would be met and, if so, how and by whom. The various new republics did not agree on how to assume responsibility for the dissolved state's liabilities and assets. Consequently, each sovereign, including Slovenia, has had to make its own efforts to deal with the financial consequences of dissolution. The individual republics have pursued strategies of negotiated or "conditional" succession with various nations and international organizations. Croatia, for example, has conducted its own bond exchange in an effort to assume its share of the former state's debts.[2]

Montenegro). *See generally* Carsten Thomas Ebenroth & Matthew James Kemner, *The Enduring Political Nature of Questions of State Succession and Secession and the Quest for Objective Standards*, 17 U. Pa. J. Int'l Econ. L. 753 (1996); Marc Weller, *The International Response to the Dissolution of the Socialist Federal Republic of Yugoslavia*, 86 Am. J. Int'l L. 569 (1992).

**2.** Plaintiff brought a separate action against the Republic of Croatia, certain Croatian banks, and Chase on July 24, 1996 based on circumstances arising from the Croatian Exchange. *See Yucyco v. Republic of Croatia, et al.*, 96 Civ. 5559(DC), 1997 WL 728173 (S.D.N.Y.1997).

On November 30, 1995, Slovenia offered to assume a share of Yugoslavia's debt under the NFA in an effort to normalize its relations with the international community. Specifically, Slovenia sought to exchange its own, newly-issued obligations for a portion of the outstanding debt under the NFA (the "Exchange"). Upon the consent of creditors holding at least two-thirds of the aggregate principal amount of the outstanding loans (the "Majority Creditors"), Slovenia offered to issue to each "participating creditor" bonds in the amount of approximately 18% of the participating creditor's refinancing loans. In return, the consenting creditors would release all Slovenian entities—all entities organized in Slovenia that are majority-owned or controlled by Slovenia, including the Slovenian bank defendants in this case as well as entities not involved in the transactions here at issue—would be released from any liability arising under the NFA. Banka Slovenije would replace the National Bank of Yugoslavia as the Paying Agent under the NFA.

The Exchange was offered only to "participating creditors." It was not offered to creditors that appeared on a list, compiled by the United States Treasury Office of Foreign Asset Control ("OFAC"), of entities presumed to be controlled by the Serbian government, which had seized billions of dollars of the former Yugoslavia's foreign currency reserves.[3] Because Yucyco was on the list at the time of the Exchange, it was not permitted to participate. It was removed from the list in February 1996, although the removal apparently did not become effective until June 25, 1996, after the Exchange closed.

The terms of the Exchange were accepted by nearly 80% of the international creditors. Yucyco did not tender its consent and vigorously opposed the transaction. Thereafter, on June 11, 1996, Slovenia issued approxi-

mately $812 million in bonds to participating creditors who timely tendered their NFA refinancing loans. Participating creditors were thus able to exchange approximately 18% of their NFA refinancing loans for new Slovenian bonds. Yucyco, however, was not permitted to do so.

### D. *The Amended Complaint*

Yucyco filed suit in this Court on June 10, 1996. The amended complaint sets forth seven causes of action. The first, second, and fifth causes of action allege breach of contract claims against all the Slovenian defendants based on the NFA. The third cause of action is asserted against Slovenia only, purportedly as successor to Yugoslavia, on the Guaranty. The fourth cause of action is asserted against Chase only and seeks an injunction ordering Chase to declare an event of default under the NFA and declaring the refinancing loans immediately due and payable. The sixth cause of action is asserted against the defendants other than Chase that are "parties to the NFA" for breach of their contractual duty of good faith and fair dealing. Finally, the seventh cause of action asserts a claim for tortious interference against defendants Ljubljanska Banka d.d., Kreditna Banka Maribor d.d., Nova Ljubljanska Banka d.d., and Nova Kreditna Banka Maribor d.d., to the extent they "are deemed not to be parties, or successors to parties, to the NFA."

These motions followed.

### DISCUSSION

### A. *Standard for Motion to Dismiss*

In deciding a motion to dismiss under Rule 12(b), this Court must view the complaint in the light most favorable to the plaintiff and accept all allegations contained therein as true. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90

---

**3.** On May 30, 1992, President Bush issued Executive Order 12808, which provided that:

[T]he actions and policies of the Governments. of Serbia and Montenegro, acting under the name of the Social Federal Republic of Yugoslavia or the Federal Republic of Yugoslavia, ... constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States.

57 Fed.Reg. 23299 (1992). President Bush ordered that all property and interests in the name of the Social Federal Republic of Yugoslavia or the Federal Republic of Yugoslavia (Serbia–Montenegro) be blocked. OFAC prepared its list in accordance with this Executive Order.

(1974); *Nova Int'l, Inc. v. American Express Bank, Ltd.*, 1996 WL 39317, *2 (S.D.N.Y. Jan.31, 1996). All reasonable inferences must be drawn in favor of Yucyco, and the complaint may not be dismissed unless it appears beyond doubt that plaintiff can prove no set of facts in support of its claim that would entitle it to relief. *See Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *Christ Gatzonis Elec. Contractor, Inc. v. New York City Sch. Constr. Auth.*, 23 F.3d 636, 639 (2d Cir.1994).

▇▇▇ "In determining a 12(b)(6) motion, the [C]ourt may consider documents incorporated by reference into the complaint." *Lomaglio Assocs., Inc. v. LBK Mktg. Corp.*, 892 F.Supp. 89, 92 (S.D.N.Y.1995); *see also Hertz Corp. v. New York City*, 1 F.3d 121, 124 (2d Cir.1993), *cert. denied*, 510 U.S. 1111, 114 S.Ct. 1055, 127 L.Ed.2d 375 (1994). Although the documents governing the NFA and the Exchange were not attached to the complaint, this Court may properly examine these "integral" documents in evaluating defendants' motion to dismiss. *See International Audiotext Network, Inc. v. AT & T Co.*, 62 F.3d 69, 72 (2d Cir.1995) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss . . . .").

The Slovenian defendants move to dismiss the complaint on several grounds. First, they contend that Slovenia is not a party to the NFA, and that Slovenia's liability under the Guaranty raises the nonjusticiable political question of state succession. Second, defendants insist that the complaint fails to plead claims against Banka Slovenije. Third, defendants argue that all NFA creditors must be joined in this action as indispensable parties or the action should be dismissed. Fourth, defendants seek dismissal of Yucyco's contract claims on the ground that accel-

eration of the loans is unavailable under the NFA absent approval by the creditors. Fifth, defendants maintain that the Foreign Sovereign Immunities Act ("FSIA") bars Yucyco's tortious interference claim, and that the facts alleged in the complaint fail to support the claim.

Chase has been named as a defendant only in the fourth claim. It moves to dismiss under Rule 12(b)(6), arguing that because the Majority Creditors have not authorized acceleration of Yucyco's loans, it could not, under any scenario, provide plaintiff with the relief it seeks.

## B. Analysis

### 1. Yucyco's Claims Against Slovenia

Defendants insist that Yucyco's claims against Slovenia should be dismissed as a matter of law because (a) Slovenia is not and never has been a party to the NFA, and (b) whether Slovenia is liable under the Guaranty presents a nonjusticiable political question concerning the issue of state succession. (Slov. Defs. Mem. at 16–18). In response, Yucyco makes two principal arguments: first, Slovenia effectively became a party to the NFA through its actions in effecting the Exchange, and second, Slovenia is liable on the Guaranty and no political question is implicated. (Pl. Mem. at 26).[4]

### a. Slovenia as a Party to the NFA

▇▇▇ It is well established that a plaintiff in a breach of contract action "may not assert a cause of action to recover damages for breach of contract against a party with whom it is not in privity." *Perma Pave Contracting Corp. v. Paerdegat Boat & Racquet Club, Inc.*, 156 A.D.2d 550, 551, 549 N.Y.S.2d 57, 58 (2d Dep't 1989) (citations omitted); *see also Smith v. Fitzsimmons*, 180 A.D.2d 177, 180, 584 N.Y.S.2d 692, 695 (4th Dep't 1992) ("As a general rule, privity or its equivalent remains the predicate for imposing liability for nonperformance of contractual obligations.").

---

4. In its amended complaint, Yucyco alleges that: Defendant Republic of Slovenia purports to be a successor in interest to the Socialist Federal Republic of Yugoslavia with respect to the rights and obligations of some or all of the Obligors under the NFA. As a state which was part of the guarantor at the time of the NFA, Defendant Republic of Slovenia is liable as a successor in interest under the NFA Guaranty. (Am.Compl.¶ 3).

Here, Yucyco acknowledges that Slovenia is not a signatory to the NFA, but contends that Slovenia transformed itself into an obligor under the NFA by playing an "integral role" in the restructuring of the NFA debt and by assuming a portion of the debt. (P1. Mem. at 30). (Am. Compl. 1 16–17).

■ This argument fails. Slovenia's involvement in the Exchange is no basis for holding it liable under the NFA in general. Slovenia agreed to the terms of the Exchange and nothing more. It agreed to accept only a limited portion of the former Yugoslavia's obligations; it did not agree to assume any further obligations, under the NFA or otherwise. Because "a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned the contract," plaintiff may not assert its NFA-based claims against Slovenia. *Crabtree v. Tristar Automotive Group, Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991).

Yucyco also argues that Slovenia is liable under the NFA as an "Obligor" because Slovenia purported to be a "Yugoslav Obligor," as defined in the NFA, for purposes of the Exchange. Slovenia had to be classified as a "Yugoslav Obligor" for the Exchange to qualify as a "Qualified Weighted Average Exchange" ("QWAE") as opposed to a "Qualified Pro Rata Exchange" ("QPRE"). If the Exchange were not deemed a QWAE but were instead deemed a QPRE, no creditors under the NFA would have been able to participate in the Exchange unless all creditors were offered the opportunity to do so, and Slovenia would not have been able to exclude creditors such as those on the OFAC list. Yucyco contends that by agreeing to be a "Yugoslav Obligor," Slovenia became an "Obligor."

The difficulty with this argument, however, is that the two terms—"Obligor" and "Yugoslav Obligor"—are defined differently in the NFA. The definition of "Obligor" includes the National Bank of Yugoslavia and the other Yugoslav banking institutions that are parties to the NFA. The term "Yugoslav Obligor" includes a "Yugoslav Entity that is not ultimately controlled ... by a Non-Yugoslav Person." In turn, a "Yugoslav Entity" is defined as any "Obligor," "Agency" ("any agency of Yugoslavia or *of* any of the republics or autonomous provinces thereof") (emphasis added), or "other corporation, partnership, joint venture, business entity of any kind ..., bank or financial institution organized under the laws of Yugoslavia or any political subdivision thereof." [5]

The fact that Slovenia was considered a "Yugoslav Obligor" for the Exchange does not mean that it became an NFA "Obligor." While the "Obligors" signed the NFA and undertook certain obligations to repay the loans, "Yugoslav Obligor" is merely a defined term that includes, in addition to "Obligors," general categories of entities not party to the NFA. Slovenia did not assume the obligations of an "Obligor" merely by agreeing to be a "Yugoslav Obligor." Indeed, the consents authorizing the transaction clearly state that Slovenia would act as "Yugoslav Obligor" "*solely* for purposes of characterizing the Exchange as a Qualified Weighted Average Exchange." (Mrak Declar., Ex. B., at Annex A) (emphasis added).

■ Finally, Yucyco suggests in its papers in opposition to defendants' motions that Slovenia is liable for the actions of Slovenian Obligers on an alter ego or "piercing the corporate veil" theory. (P1. Mem. at 33). The argument must be rejected as well, for Yucyco did not allege such a theory in its amended complaint, and it is well-settled that a "claim for relief 'may not be amended by the briefs in opposition to a motion to dismiss.' " *Telectronics Proprietary, Ltd. v.*

---

**5.** Slovenia clearly does not fall within the NFA's definition of "Obligor"; it is not a bank or banking institution and was not a party to the NFA. Although Slovenia also probably does not technically fit within either of the other categories of "Yugoslav Entity," as it is not an "Agency" or a "business entity," it does make sense to treat Slovenia as a "Yugoslav Entity" for these purposes. The purpose of the distinction between QWAE's and QPRE's apparently was to give banks and other financial institutions or business entities from Yugoslavia or from one of its republics or provinces the ability to exchange debt without requiring them to offer the opportunity to all creditors. As Slovenia was once part of Yugoslavia, the definition of "Yugoslav Obligor" logically includes Slovenia.

*Medtronic, Inc.*, 687 F.Supp. 832, 836 (S.D.N.Y.1988); *see also Green v. Bauvi*, 792 F.Supp. 928, 936 n. 11 (S.D.N.Y.1992) (refusing to consider factual allegations in opposition papers not contained in second amended complaint). Nor has Yucyco offered sufficient facts to support such a claim. Although Slovenia was intimately involved in the Exchange, that fact alone does not suggest that Slovenia "exercise[d] general control over the day-to-day activities" of the Slovenian banks or that it engaged in conduct that would trigger alter ego liability. *Gabay v. Mostazafan Found. of Iran*, 151 F.R.D. 250, 254 (S.D.N.Y.1993).

In short, Yucyco has not sufficiently alleged a basis for a breach of contract claim against Slovenia under the NFA.

#### b. *Slovenia as a Successor to Yugoslavia as Guarantor*

■ Yucyco's claims against Slovenia based on the Guaranty similarly fail as a matter of law. Under principles of international law, a successor state such as Slovenia is not bound by its predecessor's agreements. Furthermore, Yucyco fails to allege any facts suggesting that Slovenia has voluntarily assumed Yugoslavia's financial duties under the Guaranty.

■ "International law sharply distinguishes the succession of state, which may create a discontinuity of statehood, from a succession of government, which leaves statehood unaffected." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F.Supp. 619, 621 (S.D.N.Y.1990), *aff'd*, 925 F.2d 566 (2d Cir.1991). Although a mere change in "government, regime or ideology has no effect on that state's international rights and obligations . . ., where one sovereign succeeds another, and a new state is created, the rights and obligations of the successor state are affected." *Id.* A full successor state, unlike a state that has experienced a mere change in government or ideol-

ogy, is not bound by the contracts executed by the former sovereign. *Id.; see also* Restatement (Third) of Foreign Relations Law § 208 ("When the state ceases to exist, its capacities, rights, and duties terminate."); *id.* § 210 ("When part of a state becomes a new state, the new state does not succeed to the international agreements to which the predecessor state was party, unless, expressly or by implication, it accepts such agreements and the other party or parties thereto agree or acquiesce.").[6]

The Restatement of Foreign Relations Law defines a successor state as one

> that wholly absorbs another state, that takes over part of the territory of another state, that becomes independent of another state of which it had formed a part, or that arises because of the dismemberment of the state of which it had been a part.

Restatement § 208, Comment B.

In the instant case, Yucyco does not deny that Slovenia is one of five successor states to the now-dissolved Yugoslavia. (Pl. Mem. at 27). Slovenia clearly constitutes a successor state within the meaning of the law. The Yugoslav government did not merely see its power taken over by a new government. Rather, Yugoslavia has been dismembered, its boundaries have been dramatically redrawn, and multiple sovereigns exist where once there stood a single nation. There can be little doubt that Slovenia exists today "because of the dismemberment of the state of which it had been a part." Restatement (Third) § 208, Comment B.

The cases cited by Yucyco to the contrary are inapposite, as they involve the mere succession of governments rather than the creation of whole states. *See, e.g., Trans–Orient Marine*, 731 F.Supp. at 623 ("The military coups of 1985 and 1989 did not effect succession of the state of Sudan but merely changed the state's governing body, leaving the state's obligations undis-

---

**6.** *See generally* Marjorie M. Whiteman, 2 Digest of International Law 824 ("Since the contractual relationship expires with change of sovereignty those clauses of an administrative contract relating to indemnity or guarantees cannot oblige the successor State.") (quoting D.P. O'Connell, *The Law of State Succession* 137–38 (1956)); *see also*

Hubert Beemelmans, *State Succession in International Law: Remarks on Recent Theory and State Praxis*, 15 B.U. Int'l L.J. 71 (1997); Marco A. Martins, *An Alternative Approach to the International Law of State Succession: Lex Naturae and the Dissolution of Yugoslavia*, 44 Syracuse L.Rev. 1019 (1993).

turbed."); *Jackson v. People's Republic of China,* 550 F.Supp. 869 (N.D.Ala.1982) (People's Republic of China held liable as successor government for bonds issued by Imperial Chinese government), *aff'd,* 794 F.2d 1490 (1986), *cert. denied,* 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987); *Kunstsammlungen Zu Weimar v. Elicofon,* 536 F.Supp. 829 (E.D.N.Y.1981) (holding that GDR was entitled to possession of stolen paintings as successor government to Third Reich), *aff'd,* 678 F.2d 1150 (2d Cir.1982); *United States v. National City Bank of New York,* 90 F.Supp. 448, 452 (S.D.N.Y. 1950) (finding that Bolshevik Revolution of 1917 did not amount to state succession).

As a successor state, Slovenia is not legally bound by any contract executed by the former Yugoslavia unless Slovenia has voluntarily "assumed" the responsibilities of the predecessor state and "the other party or parties thereto agree or acquiesce." Restatement (Third) of Foreign Relations Law § 210(3); *see also Crabtree,* 776 F.Supp. at 166; Ebenroth & Kemner, *supra* note 1, at 783 (noting that U.S. adopts view of successorship summarized in Restatement).

Yucyco does not allege that Slovenia has explicitly assumed Yugoslavia's role as NFA Guarantor. Indeed, the amended complaint is devoid of any such factual allegations. Because Slovenia does not automatically succeed Yugoslavia as NFA Guarantor and there are no indications that Slovenia has voluntarily substituted itself as NFA Guarantor, Yucyco is not in privity with this defendant.

■ To the extent Yucyco now argues that Slovenia is liable for an "equitable" share of the former state's obligations under the Guaranty, such a claim poses a nonjusticiable political question. (P1. Mem. at 28). In

*Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court identified some of the characteristics of a political question:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion. . . .

*Id.* at 217, 82 S.Ct. at 710. Courts have held that certain intractable issues involving state succession may pose such problems of justiciability. *See Can v. United States,* 14 F.3d 160, 161 (2d Cir.1994) (finding claim of title to blocked assets nonjusticiable where U.S. government had not recognized North Vietnamese control of South Vietnam); *Federal Republic of Yugoslavia v. Park–71st Corp.,* 913 F.Supp. 191, 194 (S.D.N.Y.1995) (dismissing action involving "issues of state succession, competing claims to the property of a former state, [and] the allocation of the former state's property among successors").

■ Matters involving state succession do not always present nonjusticiable political questions.[7] The political question doctrine should not be invoked merely because a case involves controversial matters or issues that are of some political significance. Likewise, it is "error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Japan Whaling Ass'n v. American Cetacean Soc.,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2865–66, 92 L.Ed.2d 166 (1986). As the Supreme Court has made clear, the doctrine "is one of 'political questions,' not one of 'political cases.'" *Baker,* 369 U.S. at 217, 82 S.Ct. at 710.

---

7. Apportionment of public debt among successor states "is sometimes so complex and controversial as to defy judicial creativity, but in several instances international agreements made such apportionments and courts have interpreted and enforced them." Restatement (Third) of Foreign Relations Law § 209, note 6; *see, e.g., Virginia v. West Virginia,* 220 U.S. 1, 31 S.Ct. 330, 55 L.Ed. 353 (1911) (interpreting agreement that apportioned predivision indebtedness of original state of Virginia in "quasi-international controversy");

*Ottoman Public Debt Case,* 1 R. Int'l Arb. Awards 529 (1925); *cf. Baker,* 369 U.S. at 212, 82 S.Ct. at 707 ("While recognition of foreign governments so strongly defies judicial treatment that . . . the judiciary ordinarily follows the executive as to which nation has sovereignty over disputed territory, once sovereignty over an area is politically determined and declared, courts may examine the resulting status and decide independently whether a statute applies to that area.").

In the instant case, the Court lacks "judicially discoverable and manageable standards for resolving" Yucyco's claims against Slovenia. While the international norm may arguably be that a successor state should be held liable for a share of its predecessor's liabilities, plaintiff has not offered any basis by which this Court may "equitably" apportion Slovenia's liability, if any, under the Guaranty. Yucyco does not allege the existence of any controlling agreement, treaty, or similar instrument allocating the economic liabilities of the former nation under the Guaranty among the various successor states. As a result, this Court lacks "satisfactory criteria for a judicial determination" of Yucyco's equitable claims against Slovenia. *Coleman v. Miller*, 307 U.S. 433, 454, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939). Under the circumstances, I am unable to properly "tak[e] into account ... the property, rights and interests which pass to the successor States" to properly determine the fair share of debt that should be borne by Slovenia. Vienna Convention on Succession of States in Respect of State Property, Archives and Debts, April 8, 1983, art. 41, 22 I.L.M. 306, 324 (1983).

In addition, without the benefit of such legal instruments, resolution of Yucyco's claims would require this Court to make policy determinations—including, for example, apportionment of responsibility among the five new republics—for which the Court is ill-suited and "of a kind clearly for nonjudicial discretion." *Baker*, 369 U.S. at 217, 82 S.Ct. at 710. To the contrary, the settlement of foreign debts falls squarely within the ambit of the President's and Congress's constitutional authority. *See* U.S. Const. art. I, § 8; *id.* art. II, § 2; *see also Barclays Bank v. Franchise Tax Bd. of Calif.*, 512 U.S. 298, 325–29, 114 S.Ct. 2268, 2284–85, 129 L.Ed.2d 244 (1994) (stating that courts have "no constitutional authority to make the policy judgments essential to regulating foreign commerce and conducting foreign affairs."). This Court should not thrust itself into a role "textually committed" to the political branches by the Constitution. *Baker*, 369 U.S. at 217, 82 S.Ct. at 710.

In short, Yucyco is unable to state a claim against Slovenia under the Guaranty or the NFA. Accordingly, all claims against Slovenia must be dismissed.

### 2. *Yucyco's Claims Against Banka Slovenije*

█ Defendants further argue that plaintiff has failed to plead any claims against Banka Slovenije. Plaintiff acknowledges that it has not articulated claims specific to this defendant. Instead, Yucyco argues that Banka Slovenije, as the Paying Agent during the Exchange, must be retained in the lawsuit because its "presence may be necessary to afford Yucyco complete relief" in the event that this Court were to decide that Yucyco is entitled to participate in the transaction. (Pl. Mem. at 42–43). Construing the amended complaint liberally in plaintiff's favor, I conclude that Yucyco has failed to plead claims against Banka Slovenije.

Rule 8(a) of the Federal Rules of Civil Procedure requires that a complaint against multiple defendants "indicate clearly the defendants against whom relief is sought and the basis upon which the relief is sought against the particular defendants." *Mathews v. Kilroe*, 170 F.Supp. 416, 417 (S.D.N.Y. 1959); *see also Weiszmann v. Kirkland & Ellis*, 732 F.Supp. 1540, 1549 (D.Colo.1990) (" [W]here ... there are multiple defendants, the complaint should specify what conduct by each defendant gives rise to the asserted claim"). Here, however, Yucyco alleges only that "Banka Slovenije is responsible in whole or in part for negotiating and proposing the exchange of to-be-issued bonds for NFA Refinancing Loans." (Am.Compl.¶ 6). Plaintiff does not allege that Banka Slovenije is a party to the NFA or the Guaranty. But even assuming Banka Slovenije were a party to either agreement, plaintiff fails to explain how "responsibility" for "negotiating and proposing" the Exchange would constitute breach of contract. Additionally, a mere assertion that the defendant "may" be necessary under a speculative scenario for relief is insufficient to justify its continued presence in this litigation. Thus, Yucyco's pleadings against this defendant are inadequate, and

the claims against Banka Slovenije are dismissed.

### 3. *Other Creditors as Indispensable Parties*

█ Defendants further contend that Yucyco must join as indispensable parties the more than one hundred NFA creditors that executed the agreements, waivers, and consents authorizing the Exchange. Defendants insist that, in the event any such creditor cannot be joined, the suit must be dismissed under Fed.R.Civ.P. 12(b)(7). (Slov. Defs. Mem. at 28–31). Plaintiff argues, on the other hand, that nonparty NFA creditors are not necessary to this litigation, that complete relief may be obtained from the present parties, and that other creditors have not claimed an interest in this action. (Pl. Mem. at 5–12).

Under Rule 19(a), joinder is compulsory if: (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a).

Joinder of all NFA creditors, or even just the consenting creditors, is unnecessary in this case. Complete relief can be accorded among the current parties to this lawsuit. Although parties to a contract are typically deemed indispensable to an action to "set aside" the contract, *see Fluent v. Salamanca Indian Lease Auth.,* 928 F.2d 542, 547 (2d Cir.), *cert. denied,* 502 U.S. 818, 112 S.Ct. 74, 116 L.Ed.2d 48 (1991); *Tucker v. Nat'l Linen Serv. Corp.,* 200 F.2d 858 (5th Cir.1953), in this case plaintiff does not seek to unravel the NFA or the Exchange. Rather, Yucyco desires only to vindicate its interest in the loans for which the Slovenian banks were liable. The complaint, fairly construed, seeks a nullification of the consents only to the extent that they relieved defendants of their joint and several liability as to the loans held by plaintiff. (Am. Compl. ¶¶ 66, 73; Pl. Mem. at 11–12). Therefore, complete relief can be afforded without requiring any nonparty creditor "to do anything or change any of its positions." *Peregrine Myanmar, Ltd. v. Segal,* 89 F.3d 41, 48 (2d Cir.1996). Hence, joinder of additional creditors is not required under Rule 19(a)(1).

Nor is joinder required under 19(a)(2). No other creditor has claimed an interest in this litigation. Where, as here, absent parties fail to assert an interest in the proceedings, Rule 19(a)(2) does not mandate their joinder. *See Conntech Dev. Co. v. Univ. of Conn. Educ. Properties,* 102 F.3d 677, 682 (2d Cir.1996) (" 'Subparts (i) and (ii) [of Rule 19(a)(2) ] are contingent ... upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action.' ") (quoting *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1043 (9th Cir.1983)).

The terms of the NFA provide an additional basis for not requiring joinder under Rule 19(a)(2). The NFA provides that the refinancing loans constitute "independent" debts that may be enforced without requiring joinder of any other creditor. Section 14.13 provides that

> the amounts payable at any time ... to each Creditor shall be a separate and independent debt and each Creditor shall be entitled to protect and enforce his rights arising out of this Agreement, and it shall not be necessary for any other Creditor to be joined as an additional party in any proceedings for such purpose....

Thus, the parties to the agreement have unambiguously agreed that the liability of the various obligors shall be borne jointly and severally. *See Conntech Dev. Co.,* 102 F.3d at 682 (holding that state was not an indispensable party where it "deliberately included language in its lease that appears to disavow ... an interest" in action). Because liability for the loans is joint and several, other NFA creditors are not indispensable parties to this suit. *See Jones Knitting*

*Corp. v. A.M. Pullen & Co.*, 50 F.R.D. 311 (S.D.N.Y.1970) ("It is well established that parties who are jointly and severally liable are not indispensable parties under Rule 19. . . . "); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 7 *Federal Practice & Procedure* § 1613, at 181–82 (2d ed.1986). Thus, resolution of a single NFA creditor's claims, such as those of Yucyco, would not "impair or impede" the rights of other creditors.[8]

In sum, joinder of other creditors is not required under Rule 19 and the plain terms of the NFA. Therefore, this action may proceed in their absence.

#### 4. Loan *Acceleration*

■ The Slovenian defendants seek dismissal of plaintiffs' fifth and sixth claims on the ground that NFA creditors are not entitled to immediate acceleration of their loans without approval of the Majority Creditors. (Slov. Defs. Reply Mem. at 25). Defendants argue that acceleration is an unavailable remedy as consent by the creditors was neither sought nor granted in this case. Chase similarly contends that the fourth claim seeking an order "directing the Agent [Chase] under the NFA to declare [an event of default and] . . . the Refinancing Loans outstanding to be . . . forthwith due and payable" (Am.Compl.¶ 88) should be dismissed. (Chase Mem. at 6).

Yucyco acknowledges that it never sought consent for loan acceleration, but argues that this contractual condition should be waived because defendants' conduct has rendered compliance with the condition "futile." (Pl. Mem. at 15–16).

I hold that acceleration of the refinancing loans is not available under the plain meaning of the NFA. In *New Bank of New England N.A. v. Toronto–Dominion Bank*, 768

F.Supp. 1017, 1021 (S.D.N.Y.1991), a court rejected a claim for similar relief where unambiguous contractual language required majority consent before certain loans could be accelerated or foreclosed. There, as here, a credit agreement expressly provided that the majority lenders enjoyed discretion to declare all amounts owing "immediately due and payable," but the majority lenders instead chose to negotiate with the borrower to restructure the debt. Like Yucyco, the owner of the loans in *New Bank* sought to hold the borrower in default and accelerate the loans. *Id.* at 1021. Nevertheless, the court concluded that plaintiff had no contractual right to insist on immediate foreclosure. As the *New Bank* court aptly noted, "Courts have generally refused to rewrite agreements to provide minority lenders with any rights . . . which are not expressly set forth in the agreements." *Id.*

Here, the plain terms of the NFA coupled with Yucyco's failure to obtain approval by the majority lenders preclude plaintiff from obtaining the relief it seeks. As plaintiff itself has acknowledged, the NFA does not provide a single creditor with the authority to unilaterally accelerate its loans. (*See* Am. Compl. ¶ 82). Under the unambiguous provisions of the agreement, NFA creditors and their successors in interest have expressly given up their right to unilaterally declare an event of default or insist upon acceleration for failure to make payments. Section 9.02 provides in pertinent part that

> [e]ach Creditor agrees that (except as may be necessary in the reasonable judgment of such Creditor for the preservation of rights) no default, event of default, right of acceleration or obligation to make a mandatory prepayment may be declared or exercised by it . . . solely by reason of a failure on the part of any Original Borrower to pay any Eligible Principal Payment

---

8. In this respect, Yucyco's claims are not unlike those at issue in *Fleet Nat'l Bank v. Trans World Airlines, Inc.*, 767 F.Supp. 510 (S.D.N.Y.1991). In *Fleet*, a trustee brought an action against a corporate debtor for failure to pay interest on senior notes. The trustee sought, among other things, an injunction against the debtor preventing the debtor from amending subordination provisions at the expense of the senior noteholders. There, as here, the defendant-debtor insisted that other debtors (the junior noteholders) were indispensable parties to the action. The court, however, held otherwise, noting that plaintiff did not seek to enjoin existing contracts concerning the junior noteholders, but only sought relief specific to its own notes. *Id.* at 515. Similarly, Yucyco's claims arise solely from the loans it holds. Additionally, the relief plaintiff seeks appears reasonably tailored to remedy any losses incurred as a nonparticipating creditor.

or any installment of principal on any Advance or Refunding and Consolidating Loan on the payment date stated therefor. Indeed, the NFA clearly states that loans may not be accelerated absent the "request or ... consent of the Majority Creditors." (NFA § 12.01, Mrak Declar., Ex. A.). Yucyco concedes that it failed to seek such approval and that no request for acceleration was ever made by the Majority Creditors.

Although plaintiff maintains that its failure to comply with Section 12.01 should be excused due to defendants' "wrongful conduct," the amended complaint fails to allege how defendants actually prevented Yucyco from seeking the necessary consent to accelerate its loans or why compliance with this condition was "impossible." The complaint asserts, without providing any supporting facts, that "any attempt by Non–Participating Creditors such as Plaintiff to declare an Event of Default would be futile." (Am. Compl. ¶ 83).

But plaintiff has failed to allege any facts describing how each defendant affirmatively prevented plaintiff from complying with this provision. Yucyco's reliance on cases concerning waiver of contractual conditions is therefore misplaced. In each case, the party excused from a contractual condition was purposely prevented from satisfying the condition. *See Cauff, Lippman & Co. v. Apogee Finance Group, Inc.*, 807 F.Supp. 1007, 1024 (S.D.N.Y.1992) (condition that contract be approved by board "under the control of the defendant"); *Zaitchick v. American Motorists Ins. Co.*, 554 F.Supp. 209, 215–16 (S.D.N.Y.1982) (outright refusal by insurance company to pay any monies under insurance contract "made it impossible" for plaintiffs to fulfill condition that replacement actually be completed before costs were available), *aff'd*, 742 F.2d 1441 (2d Cir.1983), *cert. denied*, 464 U.S. 851, 104 S.Ct. 162, 78 L.Ed.2d 148 (1983); *McKenna v. Case*, 123 A.D.2d 517, 507 N.Y.S.2d 777 (4th Dep't 1986) (condition that vendor's attorney approve sale deemed waived where vendor specifically instructed attorney to disapprove contract).

More important, Yucyco never even sought the creditors' approval for loan acceleration. Thus, the complaint provides no reasonable basis for believing that compliance with this provision was "impossible," especially during the period before the transaction was approved and consummated. Finally, while participating creditors surely would derive some benefit from the transaction, "adverse" interest alone does not rise to the level of futility.

This Court declines to "read an ambiguity into [the NFA] because one of the parties [has] become[ ] dissatisfied with its position under the plain terms of the agreement." *New Bank*, 768 F.Supp. at 1022. Accordingly, Yucyco's fourth claim is dismissed in its entirety. Additionally, plaintiff's fifth and sixth claims are dismissed to the extent that Yucyco seeks immediate payment of its refinancing loans.

### 5. *Tortious Interference*

Finally, the Slovenian defendants contend that Yucyco's alternative claim of tortious interference with contract should be dismissed on the grounds that (a) the FSIA bars the action because 28 U.S.C. § 1605(a)(5)(B) expressly immunizes foreign agencies or instrumentalities from any claim arising out of "interference with contract rights"; (b) plaintiff pleads insufficient facts as to how the specific banks allegedly interfered with Yucyco's contractual rights under the NFA; and (c) to the extent the Slovenian banks did anything at all, they were protecting "legitimate economic interests." (Slov. Defs. Mem. at 38). In response, plaintiff argues that defendants are not immune from suit because the alleged conduct at issue falls within the "commercial activity" exception under 28 U.S.C. § 1605(a)(2), and that plaintiff has alleged sufficient facts to sustain a claim of tortious interference.

It is uncontrovertible that the FSIA "provides the exclusive source of federal jurisdiction in actions against foreign sovereigns or their instrumentalities." *Bailey v. Grand Trunk Lines New England*, 805 F.2d 1097, 1100 (2d Cir.1986), *cert. denied*, 484 U.S. 826, 108 S.Ct. 94, 98 L.Ed.2d 54 (1987); *Bryks v. Canadian Broad. Corp.*, 906 F.Supp. 204 (S.D.N.Y.1995). Section 1604 provides that "[s]ubject to existing international agreements to which the United States is a party

at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States...." 28 U.S.C. § 1604.

For purposes of this motion, the parties do not dispute that the FSIA applies to the Slovenian banks.[9] Therefore, the only questions before the Court are whether plaintiff may invoke the "commercial activity" exception to sovereign immunity under § 1605(a)(2) in light of the language in subsection 1605(a)(5)(B) prohibiting "any claim arising out of ... interference with contract rights"; and, if so, whether plaintiff has adequately stated a claim for commercial tortious interference in this case.

### a. The Applicability of the FSIA's Tortious Interference Double Exception

The Slovenian defendants contend that Yucyco's claim is barred by Section 1605(a)(5)(B) even if the conduct in question constitutes "commercial activity" within the meaning of Section 1605(a)(2). Section 1605(a)(5) provides in pertinent part that immunity shall not be afforded a sovereign entity in any case:

> not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to ... (b) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights....

In essence, defendants argue that subsection (a)(5)(B) serves as a double exception limiting not only subsection (a)(5) but also subsection (a)(2). In defendants' view, subsection (a)(5)(B) restores sovereign immunity as to

all torts listed therein, and therefore no viable claim for interference with contract rights can ever be made against a foreign state, agency or instrumentality.

Neither the Supreme Court nor the Second Circuit has ever explicitly decided whether the limitations in section 1605(a)(5)(B) restrict the "commercial activity" exception in section 1605(a)(2). Although the language of the FSIA is far from clear, several factors suggest that the limitations on sovereign liability in subsection (a)(5)(B) apply only to noncommercial torts.

First, subsection (a)(5) expressly states that its provisions apply to torts "not otherwise encompassed" in subsection (a)(2)—in other words, commercial torts. Hence, subsection (a)(5) provides an exception to sovereign immunity solely for noncommercial torts. *See WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau*, 960 F.Supp. 734, 742 (S.D.N.Y.1997); *see also Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439, 109 S.Ct. 683, 690–91, 102 L.Ed.2d 818 (1989) (referring to 1605(a)(5) as "noncommercial torts exception"); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 714 (9th Cir.1992) (same), *cert. denied*, 507 U.S. 1017, 113 S.Ct. 1812, 123 L.Ed.2d 444 (1993); *United Euram Corp. v. Union of Soviet Socialist Republics*, 461 F.Supp. 609, 612 (S.D.N.Y.1978) (same).

Because "[e]stablished canons of statutory construction" generally require that "an exception [be] considered a limitation only upon the matter which directly precedes it,'" subsection (a)(5)(B) should be read to limit only the reach of the noncommercial torts exception, and should not be construed to otherwise modify the exceptions set forth in subsections (a)(1)–(4). *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1473–74 (9th Cir. 1995) (quoting Norman J. Singer, 2A Sutherland Stat. Constr. § 47.11 (5th ed.1992)); *see WMW Machinery*, 960 F.Supp. at 742.[10]

**9.** The defendant banks claim to be "agenc[ies] or instrumentalit[ies] of a foreign state" within the definition of Section 1603. (Slov. Defs. Mem. at 33).

**10.** The Slovenian defendants cite only two decisions in which courts arguably reached a con-

trary construction of the relevant provisions. The language in *Gregorian v. Izvestia*, 871 F.2d 1515 (9th Cir.1989), upon which defendants rely, has been recently rejected as dicta by the Ninth Circuit in *Export Group*, 54 F.3d at 1472–73. In addition, although one court in has observed that

Second, most courts have interpreted the various exceptions to immunity set forth in section 1605 as mutually exclusive. *See De Letelier v. Republic of Chile,* 748 F.2d 790, 795 (2d Cir.1984) (noting that statutory language "suggests that the commercial activity exception to jurisdictional immunity under (2) and the tort exception under (5) are mutually exclusive"); *see also WMW Machinery,* 960 F.Supp. at 742; *Foremost–McKesson, Inc. v. Islamic Republic of Iran,* 759 F.Supp. 855, 859 (D.D.C.1991); *Tifa Ltd. v. Republic of Ghana,* 692 F.Supp. 393, 404 (D.N.J.1988); *Yessenin–Volpin v. Novosti Press Agency,* 443 F.Supp. 849, 855 (S.D.N.Y.1978).

Third, numerous courts, including those in this Circuit, have addressed tort claims involving commercial activity under subsection (a)(2) without finding that subsection (a)(5)(B) posed any particular difficulties. *See L'Europeenne de Banque v. La Republica de Venezuela,* 700 F.Supp. 114 (S.D.N.Y. 1988) (finding jurisdiction under commercial activity exception for claims of fraud and misrepresentation); *Gibbons v. Udaras na Gaeltachta,* 549 F.Supp. 1094, 1115 (S.D.N.Y. 1982) (finding jurisdiction under section 1605(a)(2) for fraud and interference with contract rights); *see also Gould v. Pechiney Ugine Kuhlmann,* 853 F.2d 445, 447 (6th Cir.1988) (holding that unfair competition, misappropriation of trade secrets, and interference with contractual relationship were cognizable under commercial activity exception).

For all of these reasons, I conclude that the language of section 1605(a)(5) does not limit the commercial activity exception to sovereign immunity. Consequently, Section 1605(a)(5)(B) does not preclude plaintiff's tortious interference claim.

"[i]t is difficult to conceive of a claim for 'interference with contract rights' that does not involve commercial activity," *Bryks v. Canadian Broadcasting Corp.,* 906 F.Supp. 204, 209 (S.D.N.Y.1995) (holding that FSIA precludes defamation claim even under commercial activity exception), such claims are not beyond the realm of imagination. Actions that are solely sovereign or governmental in nature, such as a government freeze on assets or an edict voiding private, non-commercial contracts, would interfere with contract rights but may not be commercial in nature.

#### b. *Whether Yucyco Has Stated a Claim for Tortious Interference*

The next question is whether Yucyco has alleged with sufficient particularity facts supporting its claim of tortious interference. To state a viable claim for tortious interference with contractual relations under New York law, a plaintiff must allege:

(1) the existence of a valid contract between plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional procuring of the breach; and (4) damages.

*Foster v. Churchill,* 87 N.Y.2d 744, 749–50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996).

Construing all reasonable inferences in plaintiff's favor, I hold that Yucyco has failed to plead sufficient facts to sustain its tortious interference claim. Neither side disputes the existence of the NFA as a valid contract or defendants' awareness of the agreement. (Am. Compl. ¶ 35; Slov. Defs. Mem. at 10–12). And, of course, Yucyco claims that it suffered damages as a result of defendants' allegedly tortious conduct. Nevertheless, plaintiff does not allege facts that, if true, would demonstrate an "intentional procuring" of a breach of contract. The amended complaint asserts that:

Defendants have tortiously, negligently, willfully, wantonly, in bad faith, and in a gross departure from moral behavior induced the parties to the NFA (including the Concurring Creditors) to breach their contractual duties and obligations to Plaintiff, including but not limited to breaches of the duty of good faith and fair dealing

*See Drexel Burnham Lambert Group, Inc. v. Committee of Receivers for A.W. Galadari,* 12 F.3d 317, 328 (2d Cir.1993) (" '[A] state engages in commercial activity ... where it exercises " 'only those powers that can also be exercised by private citizens,' " as distinct from those "powers peculiar to sovereigns" ' ") (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 704, 96 S.Ct. 1854, 1866, 48 L.Ed.2d 301 (1976)), *cert. denied,* 511 U.S. 1069, 114 S.Ct. 1644, 128 L.Ed.2d 365 (1994).

and through the delivery of consents in violation of Section 14.01 of the NFA.

(Am.Compl.¶ 109). Yucyco fails to support this assertion by specifying which defendants intentionally procured such a breach and describing the conduct of each defendant allegedly "induc[ing]" the parties to breach their obligations. *See Mathews v. Kilroe,* 170 F.Supp. at 417. Without such critical details, the amended complaint merely alleges that the remaining Slovenian defendants are "responsible for negotiating and proposing" the Exchange. (Am.Compl.¶ 3). Assuming the allegation to be true, this fact alone would fail to establish that the Slovenian banks intentionally procured a breach of contract. Yucyco's tortious interference claim is therefore inadequately pled and must be dismissed.

### CONCLUSION

For the foregoing reasons, the Slovenian defendants' motion is granted in part and denied in part. Chase's motion is granted in all respects. Because no claims remain against Slovenia, Banka Slovenije, or Chase, these parties are dismissed from the action. The claims for acceleration are also dismissed. The only claims that remain are the breach of contract and breach of good faith claims contained in the first, second, fifth, and sixth causes of action against Ljubljanska Banka d.d., Kreditna Banka Maribor d.d., Nova Ljubljanska Banka d.d., and Nova Kreditna Banka Maribor d.d. Plaintiff is granted leave to replead the seventh cause of action within 20 days hereof.[11]

SO ORDERED.

11. Although defendants did not move to dismiss the sixth cause of action as to defendants Ljubljanska Banka d.d., Kreditna Banka Maribor d.d., Nova Ljubljanska Banka d.d., and Nova Kreditna Banka Maribor d.d., for the reasons set forth in the memorandum decision that I am issuing today in the companion case, *Yucyco, Ltd. v. Republic of Croatia,* 96 Civ. 5559(DC), 1997 WL 728173 plaintiff may replead the sixth cause of action as well.