**11-1990-cv**
**Yugoimport v. Republic of Croatia, Republic of Slovenia**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: August 29, 2012     Decided: February 10, 2014)

Docket No. 11-1990-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE BANK OF NEW YORK,
          Interpleader-Plaintiff,

                v.

YUGOIMPORT,
          Interpleader-Defendant-Appellant,

                v.

REPUBLIC OF CROATIA, REPUBLIC OF SLOVENIA,
          Interpleader-Defendants-Appellees.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, SACK, and RAGGI, Circuit Judges.

Appeal from an order of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, Judge) granting summary judgment to the Republics of Croatia and Slovenia. The Bank of New York commenced this interpleader action to determine ownership of funds held in an account frozen pursuant to executive order during the Bosnian War. The district court found that the depositor was an agency of the former

1

Socialist Federal Republic of Yugoslavia and that the funds were subject to division among the Yugoslav successor states pursuant to a multilateral treaty.  Yugoimport, a Serbian instrumentality purporting to be sole successor-in-interest of the original depositor, appeals.  We affirm.

RICHARD A. JACOBSEN, Orrick, Herrington & Sutcliffe LLP, New York, NY, for Interpleader-Defendant-Appellant.

BOAZ S. MORAG, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, SAMUEL SPITAL (Richard L. Mattiaccio, on the brief), Squire, Sanders & Dempsey LLP, New York, NY, for Interpleader-Defendants-Appellees.

WINTER, Circuit Judge:

The Bank of New York commenced this interpleader action to determine ownership of $2,551,785.37 plus interest held on deposit in an account in the name of the Federal Directorate of Supply and Procurement ("FDSP"), an entity organized under the laws of the former Socialist Federal Republic of Yugoslavia ("SFRY").  The account was frozen in 1992 pursuant to executive order during the Bosnian War.

The Interpleader-Defendants, Yugoimport and the Republics of Croatia and Slovenia, all -asserted competing claims to the funds.  Yugoimport, a Serbian entity, claimed full ownership of the disputed funds as successor-in-interest to the FDSP.  The

2

Republics of Croatia and Slovenia contend that the funds should be divided among the states succeeding the SFRY pursuant to a multilateral treaty, the Succession Agreement. See Agreement on Succession Issues Between the Five Successor States of the Former State of Yugoslavia, June 29, 2001, 41 I.L.M. 3 (2002). The district court granted summary judgment to the Republics. We hold that interpretation of the Succession Agreement is governed by the Vienna Convention and that the FDSP was an agency of the SFRY. As such, the funds are subject to division under that Agreement. We, therefore, affirm.

BACKGROUND

a)  Historical Context

We summarize only the facts relevant to this appeal. Those seeking a more detailed account should go to the district court's opinion. Bank of N.Y. v. Yugoimport SDPR J.P., 780 F.Supp.2d 344, 346-49 (S.D.N.Y. 2011).

This case arises from the violent breakup of the SFRY. The ethnic, racial, and religious tensions of the Balkans, and the consequences of these tensions spanning generations, have been the subject of commentary so extensive and well-known as not to require citation. While somewhat controlled after World War II, these tensions erupted into bloodshed with the weakening of communist states in the 1980's. Beginning in 1989, the

3

constituent states of the SFRY sought independence, leading to nearly a decade of armed conflict. Slovenia formally declared independence on June 25, 1991. Croatia, Bosnia-Herzegovina, and Macedonia followed suit shortly thereafter. See Yucyco, Ltd. v. Republic of Slovenia, 984 F. Supp. 209, 212- 213 (S.D.N.Y. 1997) (describing the collapse). On April 27, 1992, the remaining territories, Serbia and Montenegro, issued a joint declaration formally dissolving the SFRY and establishing themselves as the "Federal Republic of Yugoslavia" ("FRY"). See id. The FRY purported to be the sole successor of the SFRY. See id. The other Republics disputed the FRY's claim, and the United Nations Security Council issued a resolution declaring that the claim was not "generally accepted" by the world community. U.N.S.C. Res. 757, U.N. Doc. S/RES/757, 31 I.L.M. 1427, 1454 (May 30, 1992). Additionally, the Security Council denied the FRY's request to step into the shoes of the SFRY for the purpose of continuing the SFRY's U.N. membership. U.N.S.C. Res. 777, U.N. Doc. S/RES/777, 31 I.L.M. 1427, 1473 (Sept. 19, 1992).

In December 1995, due in large part to American efforts and armed NATO intervention, representatives of Bosnia-Herzegovina, Croatia, and the FRY signed the Dayton Accords, bringing a qualified measure of peace to the region. The three Republics agreed to recognize and respect each other's sovereignty and

4

authorized the deployment of a U.N.-led multinational military implementation force in Bosnia. See General Framework Agreement for Peace in Bosnia and Herzegovina ("Dayton Accords"), Bosn. & Herz.-Croat.-Fed. Repub. Yugo., Dec. 14, 1995, 35 I.L.M. 75, 89, 92 (1996).

Because the Dayton Accords did not address a number of issues arising from the breakup of the SFRY, Annex 10 of the Accords established the Office of the High Representative to assist in the implementation of the peace. Id. at 147. The High Representative was to be appointed by the U.N. and was charged with overseeing the creation of mutual agreements among the signatory states concerning various issues. Id. One such issue was distribution of financial assets of the SFRY. See U.N.S.C. Res. 1022, U.N. S/RES/1022, 35 I.L.M. 259, 260 (November 22, 1995).

After the signing of the Dayton Accords, armed conflict between the FRY and Kosovars and continuing sole-successor sentiments in the FRY stymied the ability of the signatory states to reach an agreement. See Carsten Stahn, The Agreement on Succession Issues of the Former Socialist Federal Republic of Yugoslavia, 96 Am. J. Int'l L. 379, 379 (2002). On June 29, 2001, after NATO intervention in the Kosovo conflict and political shifts weakened FRY sole-successor sentiments, the

5

emerging successor states, under the supervision of the High Representative, finally came to an agreement.

b)  The Succession Agreement

The Succession Agreement recognizes five SFRY successor states -- Croatia, Slovenia, Bosnia-Herzegovina, Macedonia, and the FRY.  See Succession Agreement, 41 I.L.M. at 3.[1]  It contains seven Annexes, each of which deals with the division of particular types of assets and/or liabilities.  Annexes C and G are relied upon by the parties.

Annex C deals with the division of "financial assets and liabilities."  Article 1 of Annex C defines the financial assets of the SFRY to include "accounts and other financial assets in the name of the SFRY Federal Government Departments and Agencies." Id. at 25.  Article 5 provides that SFRY's foreign financial assets, including funds held in foreign banks, shall be distributed in the following proportions:  Bosnia and Herzegovina 15.50%; Croatia 23.00%; Macedonia 7.50%; Slovenia 16.00%; and the FRY 38.00%. Id. at 27.[2]  Whether the funds at issue here were

---

[1] In June 2006, Serbia and Montenegro separated into independent states. Montenegro agreed that it would not be deemed a successor state to the SFRY or a party to the Succession Agreement.

[2] Although Article 5(1) does not expressly include the assets of SFRY agencies in its definition of "foreign financial assets," there is no dispute that the distribution scheme set forth in Article 5(2) applies to foreign-held assets of SFRY agencies.  The general definition of "financial assets" embodied in Article 1 -- which includes the assets of SFRY agencies -- applies to the foreign financial assets addressed in Article 5.  Succession Agreement, 41 I.L.M. at 25.

6

held in the name of an SFRY "agency" -- i.e. FDSP -- for purposes of the Succession Agreement is the principal issue in this appeal.

Annex G deals with private property. Article 1 thereof states that "[p]rivate property and acquired rights of citizens and other legal persons of the SFRY shall be protected by successor States in accordance with the provisions of this Annex." Id. at 35. We mention this provision only because Yugoimport attaches importance to it. However, if the funds were held in the name of an SFRY agency, Annex G would be inapplicable; if not, Yugoimport would succeed on this appeal even without Annex G.

c)   The FDSP/Yugoimport

We trace the history of Yugoimport in mind-numbing detail because the nature of its governance and functions is critical -- decisive, actually -- to the disposition of this appeal.

We begin with a summary that will suffice for casual readers, who can then move on to the next section. Yugoimport functioned primarily as an arms dealer for the successive sovereign states referred to generally as Yugoslavia, from 1949 until the events giving rise to this case. It was owned, controlled, managed, and supervised at all times by the government -- in particular, by officials responsible for national defense. Its earnings were put to public purposes.

7

We now turn to the details. The original Yugoimport was created on June 27, 1949 by the Federal People's Republic of Yugoslavia (the "FPRY").[3] Basic Law on State Business Enterprises (Act No. 5585/49)(June 27, 1949). Its enabling statute described it as "[a] state business . . . of state-wide significance" created to engage in the "import and export of all types of goods." Id. arts. 1, 3. Yugoimport's initial assets were provided by the FPRY's Minister of Finance, id. art. 2, and it operated under the administrative and operational supervision of the FPRY's Ministry of Foreign Trade. Id. art. 4.

On July 28, 1971, after the FPRY became the SFRY, a new law established the basic form and substance of SFRY agencies. See Law on Organizational Structure and Scope of Operations of Federal Administration Bodies and Federal Organizations, art. 1 (Act No. 1045/71) (July 28, 1971) (hereinafter referred to as the "Law on Agencies"). One such agency was the Federal Secretariat of National Defense. Id. arts. 3, 5. In 1974, the SFRY amended the Law on Agencies in several ways. See Act on the Amendment of the Act on the Organization and Scope of Functions of Federal Administrative Authorities and Federal Organizations (Act No. 21/74) (April 26, 1974) (hereinafter referred to as the "Amending

_____

[3] The FPRY was the predecessor state of the SFRY. It existed from 1946 to 1963. Like the SFRY, the FPRY was a socialist state headed by Josip Broz Tito from 1963 to 1980.

8

Act"). Article 3 of the Amending Act set forth amendments pertaining to the SFRY Federal Secretariat of National Defense. One amendment merged Yugoimport into a new sub-agency known as the "Federal Directorate of Trade and Special Purpose Commodity Reserves" or the "Federal Office for Trading and Reserves of Special Purpose Goods" (the "Federal Office for Trading and Reserves"). See id. art. 3; Statute of the Public Enterprise "Jugoimport-SDPR," art. 2 (FRY Gazette No. 89/9) (Jan. 27, 1997) (FRY) (describing the merger in 1974 of Yugoimport into the Federal Office for Trading and Reserves). The Amending Act further stated that the Federal Office for Trading and Reserves was "established within the Federal Secretariat of National Defense for the purpose of performing tasks associated with the sale and accumulation of commodity reserves . . . for the national defense." Amending Act, art. 3 (Act. No. 21/74). In other words, the Federal Office for Trading and Reserves was the SFRY's arms dealer.

In 1991, the SFRY reconstituted the Federal Office for Trading and Reserves as the Federal Directorate for Commerce of Special Purpose Products. See Law on the Federal Directorate for Commerce of Special Purpose Products, art. 24 (SFRY Gazette No. 11/91) (1991). It is undisputed that sometime between 1991 and 1996, the Federal Directorate for Commerce of Special Purpose Products came to be known as the Federal Directorate of Supply

and Procurement, or the FDSP.[4]  For the sake of clarity, we will refer to the entity solely as the FDSP and its enabling law as the "FDSP Enabling Law" or simply the "Enabling Law."

The Enabling Law that created the FDSP set forth its function and management structure.  See id.  The Enabling Law also required management, in agreement with the Federal Executive Council, to establish within six months a governing "statute" that would describe with greater particularity the FDSP's business activities and administration.  Id. arts. 16, 17, 23.  Once created, the statute could be changed only with approval of the Federal Executive Council.  Id. art. 4.  The statute promulgated thereunder, Statute of the Federal Directorate for Commerce of Special Purpose Products (Act. No. 750-3) (May 8, 1991) (SFRY) (hereinafter referred to as the "FDSP Statute" or "Statute"), is akin to articles of incorporation.  We draw upon both the Enabling Law and the Statute to determine the defining characteristics of the FDSP.

---

[4] The parties agree that the Federal Directorate for Commerce of Special Purpose Products and the FDSP are the same entity, governed by the same organizational laws.  Additionally, the 1996 statute reconstituting the FDSP as Yugoimport, discussed infra, states that Yugoimport "keeps up the legal continuity of the Federal Directorate of Supply and Procurement established with the Law on the Federal Directorate of Supply and Procurement ("Official Gazette of SFRY" 11/91)."  Statute of the Public Enterprise "Jugoimport-SDPR," art. 2 (FRY Gazette No. 89/9) (Jan. 27, 1997).  Despite referring to the entity as the FDSP, the citation refers to the enabling law pursuant to which the Federal Directorate for Commerce of Special Purpose Products was established.

10

The primary function of the FDSP remained the procurement and trading of arms and military equipment on behalf of the SFRY. FDSP Enabling Law, art. 1 (11/91) ("The [FDSP] . . . performs activities that are in the interest of the . . . [SFRY] in the area of foreign trade commerce with armaments and military equipment."); see also FDSP Statute, art. 8 (Act No. 750-3) (describing with greater particularity the FDSP's activities "in the area of armaments and military equipment"). The FDSP was allowed to undertake other lines of business subject to approval from the Federal Secretariat for People's Defense and only so long as such undertakings did not impact its business dealings in armaments and military equipment. FDSP Enabling Law, art. 3 (11/91); FDSP Statute, art. 9 (Act No. 750-3). The FDSP was required to "direct its work in accordance with the plans for the development and equipping of the military," FDSP Statute, art. 12 (Act No. 750-3), and it was the FDSP's "responsibility . . . to organize and prepare for action in cases of immediate war danger . . . [and] to perform other tasks and activities that are in the interest of general people's defense." Id. art. 38. The Federal Secretariat for People's Defense supervised the FDSP's performance of national-interest functions, and the FDSP submitted quarterly and annual reports to the Federal Secretariat for this purpose. FDSP Enabling Law, art. 19 (11/91). Due to

11

the nature of the FDSP's work, the Enabling Law required that all employee positions within the FDSP be staffed exclusively with active military personnel.  Id. art. 18.

The FDSP was organized as a juridical entity with the "status of a legal person."  Id. art. 4.  It guaranteed its obligations with its own property, FDSP Statute, art. 2 (Act No. 750-3), and it was empowered to act "on its own behalf and own account" and on others' behalf and account pursuant to contract.  FDSP Enabling Law, arts. 7, 8 (11/91); FDSP Statute, art. 10 (Act No. 750-3).  The mutual rights and obligations of the FDSP and "those on whose behalf . . . it perform[ed] foreign trade commerce and services . . . [were] determined by contract."  FDSP Enabling Law, art. 8 (11/91).

The FDSP was managed by a Director and a Council (the "FDSP Council"), both of which were appointed, supervised, or removed by the Federal Executive Council.  Id. arts. 9-15.  The FDSP Council consisted of a representative of each of the following:

1) Federal Secretariat for People's Defense
2) Federal Secretariat for Foreign Affairs
3) Federal Secretariat for Foreign Economic Relations
4) Yugoslav National Bank
5) The Yugoslav Association of Industries for Armament and Military Equipment; and
6) A representative from the employees of the [FDSP].

FDSP Statute, art. 24 (Act. No. 750-3).  The Director was also a

member of the FDSP Council. FDSP Enabling Law, art. 11 (11/91); FDSP Statute, art. 25 (Act. No. 750-3).

The Director was responsible for, among other things, business decisions, hiring and staffing decisions, and managing the FDSP's preparation for national defense. FDSP Statute, art. 22 (Act. No. 750-3). The FDSP Council was responsible for

> 1) Pass[ing] the strategic plan;
> 2) Pass[ing] a plan for foreign trade commerce and a financial plan;
> 3) Pass[ing] a decision for the permanent and long-term investments of the [FDSP];
> 4) Decid[ing] upon the long-term acquiring of funds; [and]
> 5) Perform[ing] other tasks defined by the law . . .

Id. art. 26. The FDSP Council was also empowered to "decide[] on changes in status (splitting, merging, and acquiring)" subject to approval from the Federal Executive Council. Id. art. 3.

The FDSP's earnings were to be used to "replenish the funds spent and to provide for personal, common, and general social needs and responsibilities." Id. art. 16. If it produced a net surplus or profit in a given year, the Director and FDSP Council were to determine the division of profits in the course of preparing the annual report. Id. art. 19. If the FDSP experienced a liquidity problem or a loss, the FDSP Council was to inform the Federal Secretariat for People's Defense and the Federal Executive Council. Id. art. 21.

13

Because the FDSP operated out of Belgrade, Serbia, the FRY was able to control its physical assets during the armed conflict described supra. In 1996, the FRY formally reconstituted the FDSP as Yugoimport SDPR. The government enacted a new organizational law in September 1996, and the Belgrade Business Court issued a decision purporting to merge the two entities in early 1997. See Law on the Public Enterprise "Jugoimport-SDPR" (PR. Nr. 291) (Official Gazette of SRY No. 46/96) (Sept. 27, 1996) (FRY). Like the FDSP, Yugoimport SDPR was created pursuant to an enabling "law" and its functions and management structure were set out more precisely in a governing "statute" enacted by the managing board. See Statute of the Public Enterprise "Jugoimport-SDPR," preamble (FRY Gazette No. 89/9) (Jan. 27, 1997) (FRY), promulgated under Law on the Public Enterprise "Jugoimport-SDPR," (Official Gazette of SRY No. 46/96). The primary function of Yugoimport SDPR remained the procurement and trading of weapons and military equipment. Law on Jugoimport-SDPR, arts. 2, 4 (46/96).[5] Initial funding was provided by the state, id. art. 5, and the federal government was empowered to: (i) approve the governing statute and any changes made to the

_____

[5] According to the governing statute, "Jugoimport-SDPR deal[t] with other activities as well." Statute on Jugoimport-SDPR, art. 4. The statute listed several hundred activities, ranging from the "production, processing and refrigeration of animal meat" to publishing books and bookbinding to the "retail trade of household appliances, radios, and tv sets." Id.

14

statute thereafter; (ii) the development plan and working program; (iii) any increases or decreases in basic capital; (iv) any plans to acquire or sell real estate; (v) annual financial plans and investment decisions; and (vi) any changes to the organizational structure. Id. art. 15.

Yugoimport SDPR was managed by a Director, a Managing Board, and a Supervisory Board. Id. art. 8. The Director was appointed and subject to dismissal by the federal government. The Managing Board consisted of eight members, five of which were appointed and subject to dismissal by the federal government. Id. arts. 9, 14.[6] And the Supervisory Board consisted of a president, appointed and subject to dismissal by the federal government, and two members. Id. arts. 12, 17, 20. The enabling law permitted [Yugoimport] to be organized as a "stock-sharing company," but required that the state retain at least 51 percent ownership. Id. art. 16.

Following the dissolution of the FRY, Yugoimport has continued to operate in Serbia, presumably reorganized under Serbian law or adopted thereunder.

d) The Disputed Funds

In 1991, the FDSP opened a deposit account with the Bank of New York. On May 30, 1992, the United States, pursuant to an

---

[6] The remaining three members were elected by Yugoimport SDPR employees. Id. arts. 9, 14.

15

Executive Order issued by President George H.W. Bush, froze "all property, and interests in property, in the name of the [SFRY] or the [FRY] . . . in the United States," including property in the name of their "agencies, instrumentalities and controlled entities, and any person acting or purporting to act for or on behalf of any of the foregoing." Exec. Order No. 12808, 57 F.R. 23299, Sec. 2, 4(c) (May 30, 1992). On July 20, 1992, the Office of Foreign Assets Control, a division of the Department of Transportation, published a notice containing a list of "entities owned or presumed to be controlled by the [FRY]." Office of Foreign Assets Control General Notice No. 1, 57 F.R. 32051-02 (July 20, 1992). The FDSP was on the list. Id. The asset freeze remained in place until February 2003. This litigation commenced shortly thereafter.

e) Procedural History

In light of Yugoimport's and the Republics' competing claims of ownership of the funds, the Bank of New York filed this interpleader action on April 14, 2003 in New York state court. Pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1441(d) and 1446, Slovenia removed the case to the Southern District of New York, where it was initially assigned to Judge Charles S. Haight.

16

The bank deposited the disputed funds into the district court's registry and, on June 2, 2004, obtained a discharge from this action. Judge Haight ordered limited discovery on the issue of the FDSP's status as an SFRY agency, which is of course critical to the application of Annex C of the Succession Agreement. On July 31, 2006, the Republics moved for summary judgment or, in the alternative, for a stay to allow the Standing Joint Committee under the Succession Agreement to make a determination regarding whether the funds were subject to division.[7] On September 22, 2006, Yugoimport cross-moved for summary judgment and opposed the Republics' motion to stay, arguing that it was not subject to the jurisdiction of the Standing Joint Committee. On May 11, 2007, Judge Haight stayed the case so that the Standing Joint Committee could decide the issue. Bank of New York v. Yugoimport SDPR J.P., No. 03 Civ. 9055, 2007 WL 1378426, at *10-11 (S.D.N.Y. May 11, 2007) (hereinafter "Yugoimport I").

---

[7] Article 5 of the Succession Agreement sets forth dispute-resolution methods that the successor states are to use in the event of disagreement:

> If the differences [over interpretation] cannot be resolved . . . the States concerned shall either (a) refer the matter to an independent person of their choice, with a view to obtaining a speedy and authoritative determination of the matter . . .; or (b) refer the matter to the Standing Joint Committee.

41 I.L.M at 5. The Standing Joint Committee, established by Article 4 of the Succession Agreement, consists of senior representatives of each successor state. Id. at 4.

17

In the fall of 2008, the case was reassigned to Judge Alvin K. Hellerstein, who lifted the stay because, in the interim, the successor states had not appointed any members to the Standing Joint Committee and it had never met. On April 29, 2011, the district court granted the Republics' motion for summary judgment and held that the funds were to be divided among the successor states. It based this holding on its conclusion that Yugoimport was an agency, as a matter of law, under Annex C of the Succession Agreement. Bank of New York v. Yugoimport SDPR J.P., 780 F. Supp. 2d 344 (S.D.N.Y. 2011) (hereinafter "Yugoimport II").

DISCUSSION

We review a grant of summary judgment de novo. K&A Radiologic Tech. Serv's, Inc. v. Comm'r of the Dep't of Health of New York, 189 F.3d 273, 278 (2d Cir. 1999) (citing Bogan v. Hodgkins, 166 F.3d 509, 511 (2d Cir. 1999)).

a)  Application of the Succession Agreement

When subject matter jurisdiction is based on the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. §§ 1441(d), 1446, 1603(a), we apply the choice-of-law rules of the forum state, here New York, with respect to all issues governed by state substantive law. Barkanic v. Gen. Admin. of Civil Aviation of the People's Republic of China, 923 F.2d 957, 959 (2d Cir.

18

1991).[8]  New York courts adopt a "center of gravity" approach to choice-of-law questions in contract cases.  This approach requires application of the law of the jurisdiction with the most significant interest in, or relationship to, the dispute.  Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1030-1031 (2d Cir. 1996) (citing In re Allstate Ins. Co. & Stolarz, 81 N.Y.2d 219, 227 (1993))); Auten v. Auten, 308 N.Y. 155, 160-61 (1954).  To determine the jurisdiction with the greatest interest in the dispute, New York courts consider "a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile . . . of the

_____

[8] The FSIA, 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611, grants foreign sovereigns general immunity from suit in the U.S., id. § 1604, unless the action falls under one of several enumerated exceptions. Id. §§ 1605-1607.  Where an exception applies, district courts have original jurisdiction over the action, id. § 1330, and if the action was brought in state court, the foreign sovereign may remove it to the district court of the district encompassing the state in which the action is pending.  Id. § 1441(d).
    Congress did not intend that the FSIA establish substantive rules of liability.  See Barkanic, 923 F.2d at 960 (quoting Verlinden v. Cent. Bank of Nigeria, 647 F.2d 320 (2d Cir. 1981), rev'd on other grounds, 461 U.S. 480 (1983)).  The FSIA operates as a pass-through, granting federal courts jurisdiction over otherwise ordinary actions brought against foreign states. It provides foreign states and their instrumentalities access to federal courts only to ensure uniform application of the doctrine of sovereign immunity.  Id. at 960-961.
    Because the FSIA creates federal question jurisdiction but does not supply any substantive law of liability, see Verlinden, 461 U.S. at 491-93, choice of law problems arise in the FSIA context.  The FSIA contains no express choice of law provision, but Section 1606 provides that a foreign sovereign "shall be liable in the same manner and to the same extent as a private individual under like circumstances."  28 U.S.C. § 1606.  In Barkanic, we found that the goal of like-treatment is best served by applying the state choice of law rules if the action is governed by state substantive law. Barkanic, 923 F.2d at 959.

19

contracting parties." Brink's, 93 F.3d at 1031 (citing In re Allstate, 81 N.Y.2d at 227). New York choice-of-law rules also "require[] the court to honor the parties' choice [of law provision] insofar as matters of substance are concerned, so long as fundamental policies of New York law are not thereby violated." Woodling v. Garrett Corp., 813 F.2d 543, 551 (2d Cir. 1987).

The countries with the strongest interest in the present dispute are the successor states. All of them, except for non-party Macedonia, have ratified or acceded to the Vienna Convention on the Law of Treaties (the "Vienna Convention"), opened for signature May 23, 1969, 1155 U.N.T.S. 331, reprinted in 8 I.L.M. 679, which contains a set of interpretive rules regarding treaty interpretation.[9] Prior to its dissolution, the SFRY was also a party to the Vienna Convention. Moreover, Article 9 of the Succession Agreement provides that the

---

[9] The Vienna Convention was adopted on May 22, 1969 by the United Nations Conference on the Law of Treaties. http://treaties.un.org/Pages/ViewDetailsIII.aspx?&src=TREATY&mtdsg_no=XXIII~1&chapter=23&Temp=mtdsg3&lang=en (last visited Jan. 16, 2014). To date, 113 nations are parties to the Convention and 45 nations are signatories to it. Id.

The SFRY signed and ratified the Vienna Convention on May 23, 1969. Id. After the dissolution of the SFRY, Slovenia became a party on July 6, 1992; Croatia on October 12, 1992; Bosnia-Herzegovina on September 1, 1993; and Serbia on March 12, 2001. Id. All the pertinent countries became parties to the Vienna Convention prior to the finalization of the Succession Agreement on June 29, 2001. See Vienna Convention, art. 4, 1155 U.N.T.S. at 334 (explaining that the Convention does not apply retroactively to treaties already in force); Chubb & Son, Inc. v. Asiana Airlines, 214 F.3d 301, 308 n.5 (2d Cir. 2000) (same).

20

Succession Agreement is to be interpreted in accordance with international law, of which the Vienna Convention is an integral part. See supra n.9; Succession Agreement, art. 9, 41 I.L.M. at 9. Therefore, under New York's choice-of-law principles, we apply the interpretative rules set forth in the Vienna Convention.

To reiterate, the issue is whether the FDSP was an agency of the SFRY as that term is used in the Succession Agreement. The term agency is not defined in the Succession Agreement, and neither party has supplied a definition under SFRY law. Under the Vienna Convention, terms in a treaty are to be interpreted in accordance with their ordinary meaning. Vienna Convention, art. 31(1). A term's ordinary meaning is generally derived from the language in which the treaty was drafted. See id. art. 33 (providing that treaties authenticated in two or more languages "are equally authoritative in each language," and where language divergences create ambiguity, courts should adopt the meaning which "best reconciles the texts"). The Succession Agreement was drafted in English. In at least one instance where a concept was apparently not susceptible to English translation, i.e., "dwelling rights," the Agreement provided Croatian, Slovenian, and Serbian versions to clarify its meaning. Succession Agreement, Annex G, art. 6, 41 I.L.M. at 36. The absence of such non-English versions of the term agency indicates that there was

21

no intended meaning beyond the plain-language English definition. Therefore, we construe the term "agency" in accordance with generally-accepted international principles and its ordinary meaning in English.

A principal-agent relationship is "created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that other party by words or actions." AGENCY (1), Black's Law Dictionary (9th ed. 2009). The fact that FDSP was organized as a corporation does not preclude it from being deemed an SFRY agency under the Succession Agreement. The definition of "federal agency" in Black's Law Dictionary expressly includes government corporations: "A department or other instrumentality . . . , including a government corporation." AGENCY (3), Black's Law Dictionary (9th ed. 2009).

As the district court observed, "there is nothing inconsistent, or even unusual, about a state employing the corporate form to create an agency." Yugoimport II, 780 F. Supp. 2d at 356. Quite the contrary, many governments have public corporations that function as agencies. As the district court pointed out in an impressive string cite, almost all of the fifty U.S. states have corporations that function as agencies. Id. at 358; see also 1 Fletcher Cyc. Corp. § 57 ("A 'public' corporation

. . . may be defined as a corporation that is created by the state as an agency in the administration of civil government.").

For the purposes of determining which entities are entitled to sovereign immunity, the FSIA, the Canada State Immunity Act, and the European Convention on State Immunity all adopt broad definitions of agency that expressly include public corporations. See 28 U.S.C. § 1603(b) ("An 'agency or instrumentality of a foreign state' means any entity (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof . . ."); Canada State Immunity Act, R.S.C. 1985, c. S-18, § 2; European Convention on State Immunity Explanatory Report, Art. 27 ¶ 107-109 (noting that "proceedings are frequently brought . . . not, strictly speaking, against a State itself, but against [] legal entit[ies] established under the authority of the State and exercising public functions" and that such entities "may be . . . State agencies, such as national banks or railway administrations").

Under any reasonable understanding of the term, there is no doubt that the FDSP was an agency of the SFRY, as the exhaustive description of its origins, ongoing governance, and role showed. It was, at all times, controlled by the government; its

23

management consisted of government officials; it was subject to supervision by the Federal Secretariat of People's Defense and the Federal Executive Council; its earnings were to be used not only to "replenish[] funds spent" but also "to provide for personal, common, and general social needs and responsibilities"; and management could not alter the FDSP Statute without approval from the Federal Executive Council. FDSP Enabling Law, arts. 19, 12, 15, 16 (11/91); FDSP Statute, art. 16 (Act. No. 750-3). Moreover, the FDSP served a purpose so elemental to a nation-state government as to render any suggestion that it was not an SFRY agency risible.

A compelling reason for the existence of nation states is to strengthen military defense, as the American experience demonstrates. The FDSP was the SFRY's arms dealer, charged with equipping the SFRY's military forces according to strategic needs determined by the SFRY. It was required to coordinate its work with the government's military planners, and it was the FDSP's "responsibility" to supply the military to meet its perceived needs. Even in the SFRY -- a socialist state where many enterprises were owned and controlled by the government -- the FDSP was clearly a governmental agency because of the important national-interest functions it performed.

In an effort to avoid this plain language interpretation, Yugoimport submitted several pieces of extrinsic evidence, including: (i) an affidavit of Dr. Veroljub Dugalić, a former FRY Minister of Finance who served as a delegate in the negotiations of the Succession Agreement and as an FRY (and now as a Serbian) representative in the Annex C Committee on the Distribution of Financial Assets and Liabilities; (ii) documents purporting to represent the drafting history of the Succession Agreement; and (iii) letters submitted by the Ministers of Finance of Bosnia-Herzegovina and Serbia.[10] Yugoimport contends that the district court was able to grant summary judgment only by failing to consider or by not crediting this evidence. However, none of these items could properly have been taken into consideration under the interpretive rules set forth in the Vienna Convention.

Under the Vienna Convention, external evidence may be considered only in limited circumstances. Article 31 provides

> A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.

Vienna Convention, art. 31(1).

---

[10] We need not reach the issue of whether this extrinsic evidence, even if considered, would be sufficient to alter the result. As discussed supra, the nature and functions of the FDSP may well have dictated the result we reach.

25

Yugoimport contends that the extrinsic evidence proffered is necessary to interpreting the Treaty in "context and in the light of its object and purpose." Id. However, this argument fails because the Vienna Convention expressly sets forth in Article 31 the materials that may be considered to discern that context and purpose. Context may be evaluated by consulting: (i) the text of the treaty, including its preamble and annexes; (ii) "[a]ny agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty"; and (iii) "[a]ny instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty." Id. art. 31(2) (emphasis supplied). A court may also consult: "(a) [a]ny subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; (b) [a]ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; and (c) [a]ny relevant rules of international law." Id. art. 31(3) (emphasis supplied). There is an obvious preference of the Vienna Convention toward consideration only of those materials that were ratified, adopted, or somehow endorsed by all the treaty parties. Because the documents proffered by Yugoimport are not traced to all the

successor states, the district court should not have considered them or afforded them weight in determining the context of the treaty or its object and purpose.[11]

Yugoimport next contends that such evidence is properly before the court because the treaty is ambiguous. Article 32 of the Vienna Convention states:

> Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31 [ordinary-meaning analysis], or to determine the meaning when the interpretation according to article 31: (a) [l]eaves the meaning ambiguous or obscure; or (b) [l]eads to a result which is manifestly absurd or unreasonable.

Vienna Convention, art. 32 (emphasis added). Under this Article, courts may consider certain, limited types of external evidence only to confirm the ordinary meaning of the text, or where the ordinary meaning is ambiguous or would lead to absurd results. External evidence may not be admitted to create ambiguity where there is none or to compel an interpretation different from the text's ordinary meaning.

---

[11] Yugoimport also cites Article 31(4) for the proposition that "special meaning shall be given to a term if it is established that the parties so intended." Id. art. 31(4). However, as discussed above there is no indication that the parties intended a special meaning for "agency."

27

Yugoimport contends that the treaty is ambiguous because: (i) the term agency is undefined, and (ii) Annexes C and G, when read in conjunction, create an ambiguity. We find that the Succession Agreement is not ambiguous in this regard. A failure to include a precise definition of agency does not render the contract ambiguous with regard to the term "agency," at least so far as a body intended to arm the SFRY's military is concerned. Furthermore, we perceive no relevant conflict between Annexes C and G. Annex C calls for the division of assets of governmental agencies. Annex G does not inform the definition of agency in Annex C. It provides that "private property" of legal persons shall be respected. Although Yugoimport may have been organized as a legal person, it was a public corporation that functioned, as intended, as an SFRY agency. Under no discernible principles were its funds "private property." Therefore, Annex G does not dictate otherwise.

b)  An Afterword

Although the decisive issue on this appeal is disposed of above, we address Yugoimport's argument that its corporate form shields it from application of Annex C of the Succession Agreement. Yugoimport contends that because the FDSP was organized as a corporation, under United States federal common law it is not subject to the Succession Agreement unless it is deemed to be an "alter ego" of the SFRY.

28

Yugoimport relies principally on First National City Bank v. Banco Para El Comercio Exterior de Cuba ("Bancec"), 462 U.S. 611 (1983). At issue in Bancec was whether Citibank could maintain a counterclaim against Bancec, Cuba's fully-owned foreign-trade agent, for actions taken against Citibank by the Cuban government.[12] Bancec's successor maintained that it was organized as an independent juridical entity under Cuban law and therefore could not be liable for actions of the Cuban government. The Supreme Court agreed that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." Id. at 626-27. The Court refused, however, to treat the Cuban organizational law as decisive. According "conclusive effect to the law of the chartering state in determining whether the separate juridical status of its instrumentality should be respected would permit the state to violate with impunity the rights of third parties under international law while effectively insulating itself from liability in foreign courts." Id. at 621-

---

[12] Bancec filed suit against Citibank in the Southern District of New York to recover on an unpaid letter of credit. Bancec had executed a series of contracts whereby it purchased sugar from another instrumentality of the Cuban government and then sold the sugar as export to a private company. Citibank issued the letter of credit on behalf of the private company as consideration for the sugar. Shortly after the issuance of the letter, Cuba nationalized all property belonging to American citizens and entities in Cuba, including Citibank's branch offices in Cuba. When the letter of credit became due, Citibank credited the amount due to Bancec's account but then applied the account balance to setoff the value of Citibank's lost Cuban branches. After Bancec initiated the action, Citibank counterclaimed seeking setoff based on the Cuban government's seizure of its assets. Id. at 613-16.

22. The Court ruled that foreign instrumentalities organized under foreign law as independent juridical entities are entitled to a presumption of independence, but this presumption can be overcome by equitable veil-piercing or alter-ego analysis under federal common law. Id. at 626-30.

To the extent that Yugoimport's arguments suggest that Bancec controls interpretation of the Succession Agreement as to whether FDSP was an "agency" of the SFRY, the argument fails. The purpose of treaty interpretation is to give effect to the intent of the contracting states. Bancec's alter-ego analysis applies to the unilateral acts of a single sovereign and attempts to reconcile the oft-conflicting goals of giving respect to the acts of other sovereigns while avoiding results that amount to the rewarding of fraud. Bancec's analysis simply has nothing to do with interpretation of the Succession Agreement.

Moreover, assuming the FDSP was organized as an independent juridical entity or corporation,[13] nothing in Bancec suggests that the FDSP's legal form insulates it from the Succession

---

[13] This assumption is likely correct. The FDSP was organized as a juridical entity with the "status of a legal person." FDSP Enabling Law, art. 4 (11/91). It was empowered to act on its own behalf and enter into contracts, id. arts. 7, 8, and it guaranteed its obligations with its own property, FDSP Statute, art. 2 (Act. No 750-3). The organizational laws also suggest that the government intended for the FDSP to be funded by its own commercial activities. See id. art. 16 (providing that earnings were to be used to "replenish funds spent"); id. art. 21 (providing that the FDSP Council was to inform the Federal Secretariat for People's Defense and the Federal Executive Council if the FDSP experienced a liquidity problem or a loss in any given year).

Agreement. Such a result would be contrary to both corporate law and the principles of comity animating <u>Bancec</u>. <u>Bancec</u> establishes two analytic components, a presumption of independence and alter-ego analysis, that operate in tandem.

Contrary to Yugoimport's suggestion, the Court's concern about the diversion of an instrumentality's assets was not motivated by a desire to protect instrumentalities for their own sake; the recognition of the independent status afforded to instrumentalities is derivative of, and incidental to, the underlying purpose of the presumption, which is to give respect, but not conclusive effect, to foreign sovereigns' policy decisions. <u>Id.</u> at 626-27 (observing that the presumption is based on "[d]ue respect . . . for foreign sovereigns" and "principles of comity between nations").[14]

The presumption may be overcome by alter-ego analysis, <u>i.e.</u> if the instrumentality was so extensively dominated by the

---

[14] As the Court explained, governments create juridical entities for a variety of important governmental purposes. Instrumentalities run as distinct economic enterprises are often exempt from the budgetary and personnel requirements applicable to other government agencies. <u>Bancec</u>, 462 U.S. at 624. Such instrumentalities also enjoy a greater degree of flexibility and independence from political control than typical agencies. <u>Id.</u> By delegating certain activities to such instrumentalities, governments may easily waive sovereign immunity with respect to the instrumentalities' activities, enabling third parties to deal with the instrumentality with confidence that judicial relief will be available should the need arise. <u>Id.</u> at 625. Most importantly, it is often easier to obtain large-scale financing using entities with distinct debt structures. <u>Id.</u> at 625-26. Disregarding corporate form would frustrate these objectives. In the case of a developing country, diversion of an instrumentality's assets to satisfy debts of the sovereign could stymie investment and cause third-parties dealing with the instrumentality to demand government guarantees. <u>See</u> <u>id.</u>

sovereign that a principal-agent relationship existed and where respecting the corporate form of the instrumentality "blindly . . . would cause . . . injustice."  Id. at 629, 632; see Frontera Res. Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic, 582 F.3d 393, 400 (2d Cir. 2009).  The party seeking to overcome the presumption of independence bears the burden of proof.  Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi, 215 F.3d 247, 252 (2d Cir. 2000).  This burden evinces the measure of respect due foreign sovereigns.  Alter-ego analysis is simply a back-stop measure that prevents foreign sovereigns from using their business laws to immunize themselves from third-party liability.[15]  It defies logic to apply it where, as here, there is no third-party seeking redress and Bancec is relied upon solely to shield the instrumentality from the foreign state that owns it.

For the foregoing reasons, we hold that Bancec has no bearing on the issue of whether the FDSP was an agency as that term is used in the Succession Agreement.  And, because Yugoimport cannot show as a matter of law that it was not an agency, its motion for summary judgment was properly denied.

[15] In Bancec, the Cuban government could not have brought suit in the U.S. without waiving its sovereign immunity with respect to counterclaims. Bancec, 462 U.S. at 630; see also 28 U.S.C. § 1607(c) (foreign states waive their sovereign immunity with respect to counterclaims "to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.").  Failure to apply alter-ego analysis would have permitted the Cuban government to circumvent Section 1607(c).

## CONCLUSION

For the reasons stated herein, the district court's order and opinion are AFFIRMED.